**Enriquez RIVERA, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 09–95–417 CR.**

Court of Appeals of Texas, Beaumont.

Submitted Jan. 30, 1997.

Decided June 25, 1997.

Rehearing Overruled July 24, 1997.

Tom Brown, Livingston, for appellant.

Gina M. DeBottis, Special Prosecution Unit, Huntsville, for state.

Before WALKER, C.J., and BURGESS and STOVER, JJ.

## OPINION

WALKER, Chief Justice.

A jury found appellant guilty of having committed the felony offense Possession of a Deadly Weapon in a Penal Institution. TEX. PEN.CODE ANN. § 46.10 (Vernon 1994). The trial court assessed punishment at confinement in the Texas Department of Criminal Justice—Institutional Division for a term of ten (10) years, said sentence to commence when his life sentence for Capital Murder, an unrelated felony, ceased to operate. Appellant raises a single point of error [1] for our review, *viz:* "The trial court reversibly erred in overruling Appellant's objection to the jury charge in that the same failed to instruct the jury on the law of the defense of necessity." We agree with appellant and reverse and remand for new trial.

The events surrounding the offense are not in dispute. On November 7, 1994,[2] appellant, an inmate in the Terrell Unit of the Texas Department of Criminal Justice, was involved in a physical altercation with another inmate, Gilbert Zavalla. The altercation began as a fistfight but after a short period of time other inmates, who were confined to their cells, began to throw socks with combination locks inside and "shanks," a kind of homemade dagger, onto the floor close to where appellant and Zavalla were fighting. The record does not indicate which, if either, inmate struck the first blow or if either inmate was the first to pick up a sock with a lock inside. At any rate, both appellant and Zavalla picked up a sock containing a combination lock and continued the fight with said weapon.

As appellant and Zavalla continued to fight, a third inmate, Armando Gonzales, appeared on the scene carrying a shank in each hand. Gonzales proceeded to attack appel-

---

1. Appellant refers to his complaint as a "Ground of Error." We shall refer to it as a "point of error." *See* TEX.R.APP. P. 74(d); *Hicks v. State,* 860 S.W.2d 419, 422, n. 1 (Tex.Crim.App.1993), *cert. denied,* 512 U.S. 1227, 114 S.Ct. 2725, 129 L.Ed.2d 848 (1994).

2. The judgment erroneously lists the offense date as "October 9, 1992."

lant. Appellant swung his sock at Gonzales but lost his grip and the sock flew away. Appellant was then unarmed. Zavalla and Gonzales then proceeded to assault appellant with their respective weapons "sticking him and whooping [sic] him pretty good. . . ."

Appellant managed to get behind Correctional Officer Nathan Enner who was on the scene but was unable, as per prison policy, to intervene.[3] Officer Enner instructed appellant to run to his cell. As appellant entered his cell, Officer Enner managed to get the cell door closed just ahead of Zavalla and Gonzales who were pursuing appellant.[4] Once appellant was safely inside his cell, Zavalla and Gonzales gave up their weapons. Appellant, Zavalla, and Gonzales were all taken to the prison infirmary. No visible injuries were detectable on either Zavalla or Gonzales. Medical records introduced at trial indicated appellant had suffered, in addition to the severed fingers, several stab wounds and a red area on his chest. After both sides had rested, appellant requested an instruction to the jury on the law of necessity as set out in Tex. Pen.Code Ann. § 9.22 (Vernon 1994). Section 9.22 contains the following provisions:

Conduct is justified if:

(1) the actor reasonably believes the conduct is immediately necessary to avoid imminent harm;

(2) the desirability and urgency of avoiding the harm clearly outweigh, according to ordinary standards of reasonableness, the harm sought to be prevented by the law proscribing the conduct; and

(3) a legislative purpose to exclude the justification claimed for the conduct does not otherwise plainly appear.

■ "[A]n accused has the right to an instruction on any defensive issue raised by the evidence, whether that evidence is weak or strong, unimpeached or contradicted, and regardless of what the trial court may or may not think about the credibility of the defense." *Hamel v. State,* 916 S.W.2d 491, 493 (Tex.Crim.App.1996). The State contends that an instruction on necessity was not warranted in the instant case for two reasons: 1) the defense of necessity is not available to individuals charged under § 46.10 as a matter of law, and 2) because appellant did not testify at trial, there was no evidence indicating appellant's state of mind showing he reasonably believed his conduct was immediately necessary to avoid imminent harm. Tex. Pen.Code Ann. § 46.10 (Vernon 1994) provides:

(a) A person commits an offense if, while confined in a penal institution, he intentionally, knowingly, or recklessly:

(1) carries on or about his person a deadly weapon; or

(2) possesses or conceals a deadly weapon in the penal institution.

(b) It is an affirmative defense to prosecution under this section that at the time of the offense the actor was engaged in conduct authorized by an employee of the penal institution.

(c) A person who is subject to prosecution under both this section and another section under this chapter may be prosecuted under either section.

(d) An offense under this section is a felony of the third degree.

In support of its first reason, the State relies on *January v. State,* 811 S.W.2d 631 (Tex.App.—Tyler 1991, pet. ref'd). Like appellant, the defendant in *January* was charged with possessing a deadly weapon in a penal institution and requested a necessity instruction. In finding no error in the trial court's denial of said instruction, the Tyler Court stated the following:

Q. Now, what are the rules as far as to break up inmates?
A. You call for a video camera and a supervisor before you put your hands on them.

3. Officer Enner described the policy in the following way:

Q.[State]: Okay. Were you trying to break up the fight as best you could?
A.[Enner]: Verbally, yes, sir.
Q. Okay. You didn't actually intervene?
A. No, sir.
Q. Were you supposed to intervene?
A. No, sir.

4. Sadly for appellant, Enner's attempt to spare appellant further harm was not entirely successful. In the race to get the cell door shut, appellant lost portions of two fingers when the cell door closed on them.

The trial court refused appellant's requested charge on necessity holding that, as a matter of law, necessity was not a proper defense in the instant case. We agree. The legislative purpose of section 46.11(a) [now § 46.10(a) ] is mutually exclusive with the defense of necessity. Clearly, the purpose of section 46.11(a) is to promote a weapon-free environment in penal institutions. To allow inmates to possess deadly weapons under any circumstances would pose a significant safety threat to inmates and prison personnel alike, and would seriously undermine the security of penal institutions. Thus, we conclude that the defense of necessity is not available for violations of TEX. PENAL CODE § 46.11(a).

*Id.* at 634.

While we certainly agree with the general proposition of the Tyler Court regarding the significant State interest in maintaining a weapon-free environment in our penal institutions, the facts of the instant case indicate a serious undermining of that policy with the State being, if not an intentional, at least a knowing accomplice. In the instant case, testimony from the prison personnel indicated that the prison itself supplied combination locks via the prison commissary so that inmates could secure their personal belongings in a locker located in their cells. It was, therefore, not a violation of prison regulations to possess the component parts of the deadly weapon, to-wit: one sock and one combination lock. It was only when the lock was dropped inside the sock and swung around that it became a deadly weapon, and its possession at that point a criminal offense. The compelling nature of the issues presented in this appeal make it necessary to reproduce the following cross-examination testimony from Officer Enner not merely for a description of the particular facts surrounding the incident in question, but also for a glimpse of the realities of prison life apparently faced by each inmate on a daily basis:

Q. [Trial counsel] Okay. All right. Let's go back to the beginning. When you— Was Gilbert Zavalla one of the— You run two or three at a time in the shower; right?

A. [Enner] Yes, sir.

Q. And I believe you said you had two already in the shower and you were going to get the third one, which is Mr. Rivera?

A. Yes, sir.

Q. All right. Was Gilbert Zavalla one of the other two that was already in the shower?

A. Yes, sir.

Q. Was Gonzales the third one? The one with the shank?

A. Yes, sir. Gilbert was already in the shower.

Q. Okay. Did I understand you to say that Gilbert Zavalla told you that they were from San Antonio?

A. Yes, sir. After everything happened.

Q. Okay. And he's [appellant] from El Paso?

A. Yes, sir.

Q. And according to Mr. Gilbert [sic] that in and of itself is enough to kill somebody?

A. Yes, sir.

Q. Okay. When you went to get Mr. Rivera here out of his cell, did he willingly come right out?

A. He hesitated for a minute, but it wasn't nothing I could see. I told him— I asked him if he was going to take a shower to come on out and take a shower.

Q. Okay. Did you have to tell him more than once?

A. I think probably I told him twice. Yes, sir. I sure did.

Q. Okay. Would it be fair to say he was reluctant to come out?

A. He had a strange look on his face like he knew something. But it's a[sic] everyday thing to see that. So—

Q. Okay.

[The State]: I'm sorry. I couldn't hear the last thing he said.

THE WITNESS: I said it's a[sic] everyday thing to see that.

Q. (By [Trial counsel] ) That he had a look like he knew something?

A. Yes, sir.

Q. Okay. And was reluctant to come out of his cell at the beginning?

A. Yes, sir.

Q. Okay. Did I understand you— Am I understanding this right. These guys get in a fistfight?

A. Yes, sir.

Q. And that's an everyday occurrence also, is it not?

A. Yes, sir.

Q. And all these weapons started coming out of the cells?

A. Yes, sir.

Q. So these locks in these socks and these shanks didn't belong to him?

A. No, sir.

Q. For that matter they didn't belong to Gilbert Zavalla either?

A. No, sir.

Q. The fight gets started up and all this stuff just flies out?

A. Yes, sir.

Q. The shanks, too?

A. Yes, sir.

Q. How long after they started fighting with the socks was it when the third one came up with the shank? Do you remember?

A. I'd say maybe two minutes. A minute or two minutes.

Q. Okay. Now, a minute ago you said they fought with their fist [sic] for a couple of minutes?

A. Yes, sir.

Q. Then they fight with the locks in the socks for a couple of minutes?

A. Yes, sir.

Q. And then here comes the third guy with the knife?

A. Yes, sir. And a couple of shanks.

Q. Up behind him?

A. Yes, sir.

Q. I guess to help his buddy out from San Antonio?

A. Yes, sir.

Q. He [appellant] loses his sock; right?

A. Yes, sir.

Q. And Gilbert continues to hit on him with his lock?

A. Yes, sir.

Q. Where do they get these locks?

A. From those other houses [cells].

Q. In general, where does an inmate get a combination lock?

A. They buy them at the commissary.

Q. Okay. So the unit itself sells the locks to them?

A. Yes, sir.

Q. Do they record serial numbers or anything? Any way of telling whose lock is whose?

A. I don't know.

Q. He [appellant] loses his sock. Gilbert continues to beat on him with his sock and lock; right?

A. Yes, sir.

Q. The third guy, Gonzales, keeps sticking him or trying to stick him with that shank or one like it; right?

A. Yes, sir.

Q. He's getting beat on pretty good by that point?

A. Yes, sir.

Q. He comes over and tries to get behind you?

A. Yes, sir.

Q. You say run?

A. Yes, sir.

Q. He runs? You run with him?

A. Yes, sir.

Q. With these two guys with weapons right behind him, behind the two of you?

A. Yes, sir.

Q. Trying to get to him?

A. Yes, sir.

Q. He goes in his cell, you shut the door, he's not completely in the cell, and that's the problem with the fingers; right?

A. Yes, sir.

Q. If you hadn't have shut that door, a couple of fingers would have been the least of his problems, wouldn't it?

A. Yes, sir.

Q. Anybody else see this?

A. Sergeant Purvis was right outside the door, and Officer Franchak was right outside the door.

Q. Okay. Now, Purvis came in at the end; right?

A. Yes, sir.

Q. Okay. Sergeant Purvis came in about the time, if I remember what you said, about the time that they run for the cell?

A. Sergeant Purvis, as I understand, come to the door, but Officer Franchak couldn't open the door to let him in because when something is happening in a pod you're not supposed to open the door and let anybody in— any of the officers in there, unless the supervisor and video camera gets there. So Sergeant Purvis had got to the door and was outside the door. When he got to the door, he got there at the point where everybody still had their weapons in their hand. At the time he arrived, that's when he seen Rivera here drop his sock and run over there and get behind me.

Q. Okay.

A. That's when he arrived.

Q. Okay. I thought a minute earlier you said that he— that's when he lost it?

A. Yes, sir. That's what he did.

Q. Okay. Do I understand that the way the rules work out there is that you're locked up in that room— It's a big room; right—

A. Yes, sir.

Q. with inmates who have weapons and intend on killing people, and as long as the inmates have the weapons and intend on killing people they won't let help in for you?

A. No, sir.

Q. Is that right?

A. Yes, sir.

[Trial counsel]: I pass the witness.

With all due respect to our brethren in Tyler, the holding in *January* seems to fly in the face of an analogous discussion in *Johnson v. State*, 650 S.W.2d 414 (Tex.Crim.App. 1983). In a well-reasoned opinion by Judge Wendell A. Odom, the Court held the defense of necessity was *not unavailable* as a matter of law in a prosecution for the offense of unlawfully carrying a weapon on a licensed premises. *Id.* at 416. *See* TEX. PEN.CODE

ANN. § 46.02(f) (Vernon 1994). A similar legislative purpose (weapon-free environment in places where alcohol is sold) to that theorized in *January* (weapon-free environment in penal institution) is obvious. Yet in *Johnson*, Judge Odom, writing for the Court, recognized that under certain situations involving the possession of a handgun away from one's own home in defense of self, in defense of another, or in defense of property, the legislature must have intended the defense of necessity to be available. *Johnson*, 650 S.W.2d at 416. The fear expressed in the *January* Court's holding— that any exception to the absolute ban, under any circumstances, on deadly weapons being possessed by an inmate would pose a significant safety threat to both inmates and prison personnel as well as undermine security— is a realistic one, based upon the record before us. Yet, the realistic consequence of such an absolute and inflexible holding, also indicated in the record before us, is that its affirmance would come at the expense of those most vulnerable, i.e., an unarmed inmate facing "imminent harm" from an armed aggressor, with no hope of intervention by prison personnel. It almost goes without saying that such an inmate would naturally find it "immediately necessary" to grab any implement available to assist him in what is apparently the daily prison ritual of survival of the fittest. We believe, therefore, the more reasoned response to this issue is to follow the rationale announced in *Johnson*. We hold that, when properly raised by the evidence, the defense of necessity is available to a defendant in a prosecution under § 46.10 of the Penal Code, as a matter of law.

Having held the defense of necessity was available to appellant, we now turn to the second prong of the State's response; that because appellant did not testify no evidence of his state of mind existed upon which to support a necessity instruction. Recall that an accused has a right to a defensive instruction raised by the evidence, whether weak or strong, impeached or contradicted, and regardless of the credibility, or lack thereof, of the defense. *Hamel*, 916 S.W.2d at 493. In the rather lengthy portion of Officer Enner's cross-examination testimony

reproduced above, appellant's trial counsel, by skillful questioning, had Officer Enner portray the exact scenario appellant was facing as he was confronted initially by Zavalla. The rules of the institution did not permit Officer Enner to physically protect appellant. Once the combatants were showered with deadly weapons, appellant's only choice was to either grab one and be on equal footing in the confrontation, or continue the engagement unarmed with sock/locks and shanks readily available to Zavalla. We find the evidence in the record before us was sufficient to show that appellant reasonably believed his conduct in picking up the sock/lock was immediately necessary to avoid imminent harm. As was noted in one of the cases relied on by the State, *Auston v. State*, 892 S.W.2d 141, 145 (Tex.App.—Houston [14th Dist.] 1994, no pet.), the jury charge may contain instructions on self-defense despite the fact that the defendant did not testify in order to preserve his Fifth Amendment right against self-incrimination. The *Auston* Court did not hold that the necessity defense was unavailable to a defendant who did not testify. The *Auston* Court merely held that a plea of necessity required proof of the defendant's "state of mind," and that the defendant in *Auston* did not testify, *"nor present any such evidence as to his state of mind." Id.* (emphasis added). We have such evidence in the instant case. We find, therefore, that the trial court erred in failing to include in the written instructions to the jury the appellant's requested defense of necessity. We now consider whether the charge error was harmless. In reviewing the trial court's error, we apply the standard set out in *Almanza v. State*, 686 S.W.2d 157, 171 (Tex.Crim.App.1984)(opinion on rehearing). When an error in the charge is the subject of a timely objection in the trial court, reversal is required so long as the error is not harmless. *Id.* Since a timely request for the necessity instruction was made by trial counsel, reversal is required if the error is calculated to injure the rights of appellant, which means that there must be no more than some harm to the accused from the error. TEX. CODE CRIM. PROC. ANN. art. 36.19 (Vernon 1981). The actual degree of harm must be addressed in light of the entire jury charge, the state of the evidence, including contested issues and weight of the probative evidence, the argument of counsel, and any other relevant information revealed by the record. *Almanza*, 686 S.W.2d at 171.

In the instant case, because the trial court erred in failing to submit the requested defensive issue on necessity, the jury was denied the chance to consider said defensive issue that was raised by adequate evidence. The evidence was uncontested that appellant indeed possessed a deadly weapon in a penal institution. The harm of being denied the chance for an acquittal because a proper defensive issue was not submitted to the jury was by no means minimal. Appellant suffered at least some harm. His point of error is therefore sustained.

Having sustained appellant's lone point of error, we reverse the judgment of the trial court and remand the case back to said court in order to provide appellant an opportunity for a new trial on the merits.

REVERSED AND REMANDED.