**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**

July 31, 2009

Charles R. Fulbruge III
Clerk

No. 08-10358

JOSE MERCED, President Templo Yoruba Omo Orisha Texas, Inc.,

Plaintiff-Appellant

v.

KURT KASSON; MIKE COLLINS; BOB FREEMAN; CITY OF EULESS,

Defendants-Appellees.

Cons w/ 08-10506

JOSE MERCED, President Templo Yoruba Omo Orisha Texas, Inc.,

Plaintiff-Appellee

v.

CITY OF EULESS,

Defendant-Appellant.

Appeals from the United States District Court for the
Northern District of Texas

Before BARKSDALE, DENNIS, and ELROD, Circuit Judges.

JENNIFER W. ELROD, Circuit Judge:

The Texas Religious Freedom and Restoration Act (TRFRA), Tex. Civ. Prac. & Rem. Code ch. 110, prevents the state and local Texas governments from substantially burdening a person's free exercise of religion unless the

government can demonstrate that doing so furthers a compelling governmental interest in the least restrictive manner. In this case, we must decide if the city of Euless, Texas, may practically forbid the keeping—even for brief periods—and slaughter of four-legged animals within its borders, a ban that prevents practitioners of the Santeria faith from performing ceremonies essential to their religion. We hold that, under TRFRA, the Euless ordinances at issue substantially burden plaintiff's free exercise of religion without advancing a compelling governmental interest using the least restrictive means.

José Merced is a Santeria *Oba Oriate*, or priest, and is a native of Puerto Rico who moved to Euless in 1990.[1] In 2006, the city informed Merced that he could not legally perform certain animal sacrifices essential to Santeria religious practice, though he had done so for the previous sixteen years without incident. He sued the city, seeking a permanent injunction that prohibited Euless from enforcing its ordinances that burdened his religious practice. The district court entered judgement for the city following a bench trial, but denied its request for attorney fees. We reverse the former and affirm the latter.

## I. FACTUAL AND PROCEDURAL BACKGROUND

A. *The Santeria Religion*[2]

Modern-day Santeria originated in Cuba and is a fusion of western African tribal religion and some elements of Roman Catholicism. Its practice centers around spirits called *orishas*, which are divine representatives of Olodumare, the supreme deity. Santeria rituals seek to engage these *orishas*, honor them, and encourage their involvement in the material world. Doing so requires the

---

[1] He is also the president of Templo Yoruba Omo Orisha Texas, Inc., a Santeria religious organization.

[2] This section summarizes the testimony of Merced's expert, who described the tenets of faith and the practices of the Santeria religion. The district court found the expert's testimony credible, and the city agreed.

use of life energy, or *ashé*, the highest concentration of which is found in animal blood. Thus many Santeria rituals involve the sacrifice of live animals to transfer *ashé* to the *orishas*. Although animal sacrifices are used to celebrate a range of events, including birth, marriage, and death, the most complex ceremony takes place when a new priest is initiated. This ceremony, at which a new shrine is consecrated, generally involves a sacrifice of five to seven four-legged animals (lambs or goats), a turtle, a duck, ten to fourteen chickens, five to seven guinea hens, and ten to fourteen doves in addition to other elements (songs, drum music, and the offering of other objects). The animals are usually cooked and eaten after these sacrifices.

Santeria ceremonies are highly dependent on the will of the *orisha* to which they are directed. Home shrines, which are symbols or physical manifestations of the *orishas*, are integral to Santeria, and ceremonies and sacrifices usually take place in the home of the officiating priest, although occasionally they may take place in a temple or at the home shrine of another priest. The *orishas* determine where sacrifices are to be conducted, and the priests divine the *orishas'* will by a complex divination process. There are more than 250,000 practitioners of Santeria in the world, but only two Santeria temples, neither of which is in the continental United States.[3] Thus, home sacrifice is not only the norm, but a crucial aspect of Santeria, without which Santeria would effectively cease to exist.

---

[3] Merced testified that Templo Yoruba Omo Orisha hopes eventually to build a temple, where certain ceremonies may take place if and as the *orishas* allow, but has no concrete plans to do so currently. Merced does not know where the temple will be located.

*B.     Merced's Religious Practices*[4]

In 1990, Merced moved to Euless and began to conduct ritual sacrifices. From 1990 to 2006, Merced performed the sacrifices without any interference from Euless, initiating, on average, one new priest a year. The sacrifices take place in a room attached to Merced's garage, which is isolated from the rest of the house. Merced purchases the animals from local markets and has them delivered to his house close to the time of the ceremony, usually about 15 minutes beforehand. There is no evidence that he had kept a four-legged animal in his home before sacrificing it for more than four hours. He keeps the animals caged outside until he kills them. Merced slits the carotid arteries of the animals to kill them humanely, and the blood is collected and offered to the *orishas*. The paper or plastic mats on which the sacrifices are performed are wrapped and thrown away. The edible portions of the animals are generally cooked and eaten (and some portions, like the intestines, are cooked but not eaten), and any remains are double-bagged and placed either in the trash or in a dumpster owned by another Santeria practitioner. No one had ever become sick during one of Merced's ceremonies, which generally last for several days (such that participants would presumably be in a position to observe if someone did become ill).[5]

On September 4, 2004, Merced was holding a ceremony at his home. The police received an anonymous call from a neighbor and went to Merced's house to stop the ceremony. Once there, the police called two animal control officers, who allowed Merced to finish the ceremony. In May 2006, the police received another anonymous call stating that several goats were about to be killed. Merced was, in fact, hosting a birthday celebration for which no sacrifices were

---

[4] Except as noted in the text and below, *see infra* n.9, these facts are undisputed.

[5] The city admitted in the pretrial order that it did not have any evidence to the contrary.

4

planned. When the officers arrived they told Merced not to conduct any sacrifices because they were likely illegal in Euless. Merced asked how he could obtain a permit for the sacrifices and was told to contact a supervisor. A few weeks later, Merced and another priest went to a permits office attempting to obtain a permit. They were told by two different employees that no such permit existed because animal slaughter was strictly prohibited. Merced ceased performing the sacrifices illegal in Euless (although he continued to perform Santeria rituals that are not prohibited).

Merced has delayed initiating an aspiring priest because the ceremony must be performed in his home and he cannot perform it legally. Merced is willing to comply with any disposal or health standards that Euless might create, but the city denied the availability of a permit or exception for sacrificing four-legged animals, and intends to prosecute Merced if he attempts any further sacrifices of four-legged animals.

On December 22, 2006, Merced filed a complaint against Euless and several city officials alleging violations of 42 U.S.C. § 1983, the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000cc, the First, Fifth, and Fourteenth Amendments, and TRFRA. The district court dismissed the suit as to the individual defendants because they had been sued in their personal capacities. In December, 2007, the district court dismissed the RLUIPA claim because no zoning laws were at issue. The parties conducted discovery and proceeded to trial.

C.    *Euless's Ordinances and Trial Testimony*

Before trial, the parties stipulated that six Euless ordinances prevented the sacrifice of four-legged animals:

> **Sec. 10-3. Slaughtering animals.**
> It shall be unlawful to slaughter or to maintain any property for the purpose of slaughtering any animal in the city.

**Sec. 10-5. Exceptions and exemptions not required to be negated.**

In any complaint and in any action or proceedings brought for the enforcement of any provision of this chapter, it shall not be necessary to negate any exception, excuse, provision or exemption, which burden shall be upon the defendant.

**Sec. 10-9. Penalty for violations of chapter.**

Any person violating the terms and provisions of this chapter shall be deemed guilty of a misdemeanor and shall be punished as provided in section 1-12 of this Code. Each day that such violations continues shall be a separate offense. This penalty shall be cumulative of all other remedies. No fine imposed hereunder shall be less than $25.00.

**Sec. 10-65. Animal care.**

If the following shall occur, the animal may be impounded and the owner shall be guilty of a violation of this chapter:

. . . .

(2) A person shall beat, cruelly ill treat, torment abuse, overload, overwork or otherwise harm an animal or cause, instigate or permit any dog fight, cock fight, bullfight or other combat between animals or between animals and humans.

. . . .

(4) A person shall willfully wound, trap, maim or cripple by any method any animal, bird or fowl. It shall also be unlawful for a person to kill any animal, bird or fowl, except domesticated fowl considered as general tablefare such as chicken or turkey, within the city.

**Sec. 10-68. Restriction on number of dogs, cats or other animals, or combination, to be kept in residential premises.**

It shall be unlawful to keep or harbor more than four dogs, cats or other animals, or combination of animals, beyond the normal weaning age on any premises, except as permitted in section 10-104.

**Sec. 10-104. Restrictions on size and locations of area for keeping livestock.**

It shall be unlawful to keep and maintain any mule, donkey, mare, horse, colt, bull, cow, calf, sheep, goat, cattle or other livestock at a distance closer than 100 feet from any building located on adjoining

property that is used for human habitation or within an enclosed area of less than one-half acre (21,780 square feet) per animal. All such livestock shall be kept within enclosed areas, and a fence of sufficient strength to contain such animals shall be provided to maintain the 100-foot separation required hereby. All premises upon which such livestock are kept or maintained shall be brought into compliance with the terms of this section.

Taken together, these ordinances forbid the keeping of any more than four animals at a time, and even then only certain kinds of animals are permitted. Four-legged animals such as those typically used in Santeria ceremonies (sheep and goats) are expressly disallowed to be kept—even for a brief period—or killed.[6] Such animals could be kept if the keeper has a sufficiently large piece of property to meet the requirements of § 10-104.[7]

Euless's ordinances make exceptions to these general rules, however, both on their face and in practice. Section 10-65 allows domesticated fowl to be killed, and also allows the use of rodent control materials. *See* Euless Ord. § 10-65(8). Another ordinance allows designated city employees to kill rabid or vicious animals. Euless Ord. § 10-4. In practice, the city does not enforce these ordinances against homeowners who kill rats, mice, or snakes, nor against

---

[6] Turtles clearly fall within the prohibition on killing, but it is not entirely clear that they could not lawfully be kept in Euless. The city suggests in its brief that the possession of turtles is prohibited, but the portion of the record it cites as support is testimony that turtles cannot be traded interstate, but says nothing about possession (other than prohibiting them in daycare facilities). Euless does not cite any authority for a ban on turtle possession, and Merced suggests the sale and possession of turtles is allowed with some limitation. *See* 31 Tex. Admin. Code § 65.331 (permitting possession and sale of certain kinds of turtles); 21 C.F.R. § 1240.62 (forbidding the sale of turtles with a carapace length of less than four inches).

[7] Merced's property is described in the record as a single family residence of 3,500 square feet on a wedge-shaped lot with a long driveway. The record is silent on the size of the lot. Neither party suggests that it is large enough to meet the one-half acre per animal requirement nor the 100-foot setback.

veterinarians who put down large animals.[8] The enforcement of these ordinances is complaint-driven, and Euless was unaware of any violations prior to the complaints against Merced, who, for his part, was unaware that he was violating the law before he spoke with city officials in 2006.

At trial, the city called two experts to testify, the first of which, an attorney, described the governmental purposes behind the Euless ordinances. Merced objected to this testimony, but the district court allowed it on the understanding that the expert would not merely state the law. The purpose of the prohibition on keeping livestock, according to the city's expert, is to protect the public's health and safety, primarily by eliminating the unpleasant concomitants of live animal care (e.g., runoff of urine and feces, flies, smells, noise, possible disease transmission). The expert also opined on the health ramifications of post-slaughter disposal, noting that carcasses attract bugs and vermin. He further stated that keeping various kinds of animals together in tight quarters leads to interspecies conflicts, which could lead to injury, indicating that the humane treatment of the animals is another governmental purpose.

Euless's second expert, whose expertise was public health, testified that disposing of numerous animal remains involves contact between humans and blood, which can create a breeding ground for disease. Also, he stated that enteric diseases, such as salmonella and typhoid, can result from concentrations of animal waste, and that disposal of animal remains in bodies of water is unlawful, encourages flies to breed, and causes odor and sanitation problems.[9]

---

[8] At oral argument, Euless stated that veterinarians are limited to non-residential areas by the city's zoning laws.

[9] The parties also prepared summaries of deposition testimony for other witnesses that were admitted as evidence. The thrust of the city's summaries is that Santeria sacrifices can be performed anywhere. One witness's summary, to which Merced objected as misconstruing the deposition, stated that animal carcasses from Merced's sacrifices found their way into a

Yet Euless permits the butchering and disposal of large animals, like deer, if they are dead when brought into the city. Restaurants sometimes dispose of organic waste in dumpsters, which, per the city's expert, presents the same health concerns.

The focus on disposal of the animals' remains appears to be something of a red herring. The relevant city ordinance, § 10-70 (requiring the lawful disposal of a dead animal within twenty-four hours of discovery), is not on the agreed list of ordinances that prevents Merced's sacrifices. Nor can the city legitimately object to the disposal of sacrificial animals when it permits the disposal of hunted animals. Further, Merced has expressed willingness to comply with the city's laws in that regard, and there is no evidence that he has unlawfully or unsanitarily disposed of anything. So long as he lawfully disposes of the dead animals within twenty-four hours, he has not violated the ordinance's plain terms.[10]

## D. *The District Court's Decision*

The district court adopted the parties' stipulated facts, and found that the city ordinances did not burden Merced's free exercise of religion.[11] Specifically, the court stated:

---

local wooded area or pond. The city stipulated, however—and the district court found—that it did not have any evidence that Merced unlawfully disposed of animal remains. Further, the district court credited Merced's expert, who testified that sacrifices occur where the *orishas* instruct, which is usually the home of the officiating priest, but could be a temple or the home of another priest.

[10] Euless cites a laundry list of Texas statutes and administrative regulations pertaining to the transportation, inspection, and permitting of livestock and fowl in Texas. None of these citations, however, with the possible exception of 30 Texas Administrative Code § 335.25, directly bears on the issue of a lay person lawfully disposing of the remains of healthy animals. The other disposal provisions cited by the city pertain to diseased animals. *E.g.*, 4 Tex. Admin. Code § 59.12.

[11] While the district court couched these statements as findings of fact, the conclusions regarding the elements of a TRFRA claim are, as noted below, reviewed as matters of law.

> Well, you know, this is a difficult question because if [Merced] had received the communication that said he ought to [sacrifice in his house], and refrain from doing it because of the ordinances of the city, I think I would have to say I'm persuaded that the answer to that part is yes [i.e., the ordinances burden Merced's free exercise of religion], but I haven't heard that.
>
> I don't know that I can say from a preponderance of the evidence, which is the burden that I have to apply, that the enforcement of the ordinances in question against the plaintiff burdens the free exercise of his religion. I can't do that.

In short, the district court concluded that the ordinances did not burden Merced's religious practice because he had not testified the *orishas* told him to sacrifice in his house. The court later concluded that the ordinances furthered a compelling governmental interest and were the least restrictive means of advancing them. The district court did not issue a written opinion, but entered judgment in favor of Euless and awarded costs against Merced. It denied Euless's motion for attorney fees, which the city requested under 42 U.S.C. § 1988 as the prevailing party. Merced timely filed an appeal from the judgment, and Euless timely filed an appeal from the denial of attorney fees. These appeals were consolidated in this court.

## II. DISCUSSION

Merced raises constitutional claims under the First and Fourteenth Amendments, claiming this case is "on all fours" with the Supreme Court's well-known decision in *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993). While this case shares many similarities with *Lukumi*, we begin by analyzing Merced's statutory claim under TRFRA, which, if successful, obviates the need to discuss the constitutional questions. *See, e.g.*, *Nw. Austin Mun. Util. Dist. No. One v. Holder*, 129 S. Ct. 2504, 2513 (2009) ("[I]t is a well-established principle governing the prudent exercise of this Court's jurisdiction that normally the Court will not decide a constitutional question if

there is some other ground upon which to dispose of the case." (quoting *Escambia County v. McMillan*, 466 U.S. 48, 51 (1984)); *Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 347 (1930) (Brandeis, J., concurring) ("The Court will not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of."); *Burton v. United States*, 196 U.S. 283, 295 (1905) ("It is not the habit of the court to decide questions of a constitutional nature unless absolutely necessary to a decision of the case.").

Under TRFRA, "[w]hile we must accept the trial court's fact findings supported by the evidence, the ultimate answers determine the legal rights protected by the Act and are thus matters of law." *Barr v. City of Sinton*, ___ S.W.3d ___, 2009 WL 1712798, at *8 (Tex. June 19, 2009). "A district court's legal conclusions at a bench trial are reviewed *de novo* and its findings of fact are reviewed for clear error." *Adkins v. Kaspar*, 393 F.3d 559, 563 (5th Cir. 2004).

The history of state religious freedom acts is, by now, well known. Before 1990, the United States Supreme Court interpreted the Free Exercise Clause of the First Amendment to protect religious practices substantially burdened by governmental regulation unless they furthered a compelling state interest. *See City of Boerne v. Flores*, 521 U.S. 507, 513–14 (1997); *Sherbert v. Verner*, 374 U.S. 398 (1963). In 1990, the Court in *Employment Division, Department of Human Resources v. Smith*, 494 U.S. 872 (1990), exempted from this balancing test neutral laws of general applicability, such that Oregon's criminal laws could proscribe a Native American's religious use of peyote without violating the First Amendment.[12]

---

[12] A neutral law of general applicability must still pass the strict scrutiny test if more than one constitutional right is implicated. *E.g.*, *Wisconsin v. Yoder*, 406 U.S. 205 (1972) (combining the right to free exercise of religion with parents' fundamental right to raise their children as they choose).

Congress directly responded to *Smith* by enacting the Religious Freedom Restoration Act of 1993 (RFRA), Pub. L. No. 103-141, 107 Stat. 1488 (1993) (codified at 42 U.S.C. §§ 2000bb–2000bb-4), which restored the *Sherbert* balancing test by requiring *any* governmental regulation that substantially burdened the free exercise of religion to employ the least restrictive means of advancing a compelling governmental interest. *Flores*, 521 U.S. at 512–16. The Supreme Court struck RFRA down as applied to the states, however, because it exceeded Congress's enforcement power under section 5 of the Fourteenth Amendment. *Id.* at 532–34. Texas, among other states, likewise responded to *Smith* by enacting TRFRA, which provides the same protections to religious free exercise envisioned by the framers of its federal counterpart, RFRA. *Barr*, 2009 WL 1712798 at *5. With this understanding, we turn to the text of TRFRA.

Texas Civil Practice and Remedies Code § 110.003 provides:

(a) Subject to Subsection (b), a government agency may not substantially burden a person's free exercise of religion.
(b) Subsection (a) does not apply if the government agency demonstrates that the application of the burden to the person:
    (1) is in furtherance of a compelling governmental interest; and
    (2) is the least restrictive means of furthering that interest.

The Supreme Court of Texas recently applied TRFRA for the first time in *Barr v. City of Sinton*. 2009 WL 1712798. In *Barr*, a local pastor set up a religious halfway house to help non-violent offenders reenter society; applicants were required to sign a statement of faith indicating belief in basic Christian doctrines, and to agree to a list of rules described as "biblical guidelines for Christian living." *Id.* at *1. The city then passed a zoning ordinance effectively banning halfway houses from Sinton, and the pastor sued. *Id.* at *2. The court concluded that Sinton's ordinance violated TRFRA after applying a four-part test: (1) whether the government's regulations burden the plaintiff's free exercise

of religion; (2) whether the burden is substantial; (3) whether the regulations further a compelling governmental interest; and (4) whether the regulations are the least restrictive means of furthering that interest. *Id.* at *8. We apply the same approach to the application of TRFRA.

## A. *Free Exercise of Religion*

TRFRA defines "free exercise of religion" as "an act or refusal to act that is substantially motivated by sincere religious belief. In determining whether an act or refusal to act is substantially motivated by sincere religious belief under this chapter, it is not necessary to determine that the act or refusal to act is motivated by a central part or central requirement of the person's sincere religious belief." Tex. Civ. Prac. & Rem. Code § 110.001(a)(1). As discussed in *Barr*, the focus of this initial prong is on plaintiff's free exercise of religion; that is, whether plaintiff's sincere religious beliefs motivate his conduct. 2009 WL 1712798 at *8–9. For example, if Merced wanted to keep and kill goats and sheep because he could thereby ensure the quality of the meat he consumed, such a purpose, while meritorious, is non-religious in motivation and lies beyond TRFRA's reach. Euless does not dispute that Merced's sincere religious beliefs motived his conduct; his killings were, as described by his expert, sacrifices and not mere slaughter.

## B. *Substantial Burden*

We next consider whether Euless's ordinances substantially burden Merced's sincere religious practices. According to the Texas Supreme Court, a burden under TRFRA is substantial if it is "real vs. merely perceived, and significant vs. trivial." *Barr*, 2009 WL 1712798 at *9.[13] The inquiry is case-by-

---

[13] In the context of RLUIPA, this circuit uses the following definition of "substantial burden":

> [A] government action or regulation creates a "substantial burden" on a religious exercise if it truly pressures the adherent to significantly modify his

13

case and fact-specific. *Id.*; *cf. Adkins*, 393 F.3d at 571 (applying RLUIPA). Federal case law interpreting RFRA and RLUIPA is relevant. *Barr*, 2009 WL 1712798 at \*5.

In *Sherbert v. Verner*, the case setting the standard TRFRA seeks to restore, a member of the Seventh-day Adventist Church was terminated by her employer for not working on Saturday, and applied for unemployment benefits as provided by South Carolina law. 374 U.S. at 399–400. The state denied benefits because she was able to work and refused to do so, a refusal that lacked, in the state's opinion, good cause. *Id.* at 400–01. The Supreme Court found this restriction burdened plaintiff's religious free exercise:

> Here not only is it apparent that appellant's declared ineligibility for benefits derives solely from the practice of her religion, but the pressure upon her to forego that practice is unmistakable. The ruling forces her to choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion in order to accept work, on the other hand.

*Id.* at 404. Similarly, in *Wisconsin v. Yoder*, the Court found that the state's compulsory education law burdened Amish parents' religious practices: "The impact of the compulsory-attendance law on respondents' practice of the Amish religion is not only severe, but inescapable, for the Wisconsin law affirmatively compels them, under threat of criminal sanction, to perform acts undeniably at odds with fundamental tenets of their religious beliefs." 406 U.S. at 218; *see also Thomas v. Review Bd. of Ind. Employment Sec. Div.*, 450 U.S. 707, 717–18 (1981)

---

religious behavior and significantly violate his religious beliefs. . . . [T]he effect of a government action or regulation is significant when it either (1) influences the adherent to act in a way that violates his religious beliefs, or (2) forces the adherent to choose between, on the one hand, enjoying some generally available, non-trivial benefit, and, on the other hand, following his religious beliefs.

*Adkins*, 393 F.3d at 570.

("[Where a state] denies such a benefit because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs, a burden upon religion exists. While the compulsion may be indirect, the infringement upon free exercise is nonetheless substantial.").

Our decisions interpreting RFRA and RLUIPA likewise provide guidance. In *Diaz v. Collins*, for example, we held under RFRA that a prison's grooming regulations substantially burdened a Native American's religious practice by preventing him from wearing long hair as required by his religion. 114 F.3d 69, 72–73 (5th Cir. 1997); *accord Longoria v. Dretke*, 507 F.3d 898, 903 (5th Cir. 2007) (holding that a prisoner who alleged that he was punished per the prison's rules for refusing to cut his hair, which he wore long according to his religious tradition, stated a claim under RLUIPA based on the substantial burden to his religious free exercise). We declined to find a substantial burden, however, when the prison's regulations prevented the inmate from carrying sacred items (a headband and a medicine pouch) for approximately two hours each day when he was not in his cell. *Diaz*, 114 F.3d at 72.

We reached a similar result in *Mayfield v. Texas Department of Criminal Justice*, in which prison officials severely limited the ability of practitioners of the Odinist/Asatru faith to meet as a group because a security-trained, religious volunteer was unavailable to conduct the meetings. 529 F.3d 599, 602 (5th Cir. 2008). We held, based on the summary judgment record, that a finder of fact could conclude that the prison's policy imposed a substantial burden on the plaintiff's religious free exercise. *Id.* at 614–15 (distinguishing *Adkins v. Kaspar* on the grounds that the plaintiff there had the ability to gather in a group at least once a month, a frequency not present in *Mayfield*; because the policy may not have been uniformly implemented as in *Adkins*; and because the *Mayfield* plaintiff did not have the same access to alternative means of worship as the

15

plaintiff in *Adkins*).[14]  The prison also prohibited the plaintiff from possessing runestones (small tiles made from various materials with characters of the ancient rune alphabet carved on them), which are essential to the Odinist faith. *Id.* at 602.  Here, too, we held that the plaintiff presented evidence from which a finder of fact could conclude that the prison's policies substantially burdened his religious exercise.  *Id.* at 615–16; *see also Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 333–34 (5th Cir. 2009) (finding genuine issues of material fact precluding summary judgment on the "substantial burden" question under RLUIPA when prison officials denied use of a chapel for religious services, but allowed its use for secular functions); *Baranowski v. Hart*, 486 F.3d 112, 125 (5th Cir. 2007) (holding that a prison's policy of not providing kosher foods "may be deemed to work a substantial burden upon [plaintiff's] practice of his faith").

The upshot of these opinions is that, at a minimum, the government's *ban* of conduct sincerely motivated by religious belief substantially burdens an adherent's free exercise of that religion.  While not a general rule—the inquiry is fact-specific—we note that such a conclusion accords with the Texas Supreme Court's decision in *Barr*: "A restriction need not be completely prohibitive to be substantial; it is enough that alternatives for the religious exercise are severely restricted."  2009 WL 1712798 at *12; *accord Greene v. Solano County Jail*, 513 F.3d 982, 988 (9th Cir. 2008 ) ("We have little difficulty in concluding that an outright ban on a particular religious exercise is a substantial burden on that religious exercise.").  If a government's restriction of religious conduct may be a

---

[14] In *Adkins*, a member of the Yahweh Evangelical Assembly (YEA) brought a claim under RLUIPA because inmate-adherents of that faith were not allowed to meet on YEA Sabbaths and holy days.  393 F.3d at 571.  As in *Mayfield*, the prison had a policy requiring a religious volunteer at group meetings, but an outside volunteer was able to come about once a month.  *Id.* at 562.  The YEA members also had access to religious materials (e.g., books, videos, audiotapes).  *Id.*  The *Adkins* court rejected plaintiff's RLUIPA claim because the policy did not impose a substantial burden on his religious practice as it was equally applied to all religions.  *Id.* at 571.

substantial burden, then a complete ban presents a much stronger case. We turn now to the record before us. As noted above, we review the answers to ultimate questions under TRFRA as matters of law, and accordingly undertake a review of the evidence to determine whether Euless's ordinances substantially burden Merced's religious exercise.

The district court concluded that Merced's free exercise of religion was not burdened because he did not testify that the *orishas* told him to sacrifice at his Euless home. We are troubled by this conclusion for two reasons. First, predicating a substantial burden on the results of a religious ceremony (divining the will of the *orishas*) impermissibly allows judges to evaluate the intricacies of a religious practice. The judiciary is ill-suited to opine on theological matters, and should avoid doing so. *See Smith*, 494 U.S. at 887 ("[I]t is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds. Repeatedly and in many different contexts, we have warned that courts must not presume to determine the place of a particular belief in a religion or the plausibility of a religious claim." (quotation marks omitted)).

Second, the evidence does not support the district court's conclusion. Two pieces of evidence are significant to this determination. First, Merced's expert testified, and the city conceded, that animal sacrifice is essential to the Santeria religion, and that it is usually performed in the officiating priest's house. Second, Merced testified that he ceased to perform Santeria rituals outlawed by the Euless ordinances, including the initiation of a priest. He stated that he could not initiate an aspiring priest because he could not do so in his house:

> Q. Mr. Merced, since May of 2005, have you known somebody who might have wanted to be initiated?
> A. That is correct, sir, and they are on hold. Yes.
> Q. Do they want you to initiate them?
> A. That's correct.

Q.    And you did not initiate them?
A.    Correct.
Q.    And why not?
A.    Because I cannot do it at home.

The ordaining of new priests, essential to the continuation of the Santeria religion, is barred by the Euless ordinances. Despite Euless's protestation to the contrary, the restriction on killing the four-legged animals needed to initiate priests is absolute; the ability to kill small numbers of fowl does not alter that fact.    The relevant inquiry is not whether governmental regulations substantially burden a person's religious free exercise broadly defined, but whether the regulations substantially burden a specific religious practice. *See* Tex. Civ. Prac. & Rem. Code § 110.001(a)(1) (defining "free exercise of religion" as "an act or refusal to act," indicating that a particular religious activity, not the religion as a whole, is the appropriate focus of the substantial burden analysis); *Greene*, 513 F.3d at 987 (rejecting, under RLUIPA, the broad interpretation of "religious exercise" as the general practice of one's religion in favor of a narrower interpretation that limits the concept to a particular religious practice).  Thus, Merced's ability to perform some ceremonies does not mean the city's ordinances do not burden other Santeria practices.  *See Barr*, 2009 WL 1712798 at *10 ("[A] burden on a person's religious exercise is not insubstantial simply because he could always choose to do something else."). Likewise, the city's ban on keeping livestock is effectively outright in residential subdivisions where lot sizes are often inadequate to meet the city's size and setback requirements.[15]

---

[15] Assuming the five to seven goats or sheep needed to initiate a priest, Merced would need at least two and one-half to three and one-half acres of land to meet the city's requirement.  While not impossible, compelling a person to acquire a house on such a lot in a suburban environment to keep a few animals for a matter of hours is a substantial burden.

Merced cannot perform the ceremonies dictated by his religion. This is a burden, and it is substantial. It is real and significant, having forced Merced to choose between living in Euless and practicing his religion. *Cf. Adkins*, 393 F.3d at 570 (holding that a government's regulation is significant if it "forces the adherent to choose between, on the one hand, enjoying some generally available, non-trivial benefit, and, on the other hand, following his religious beliefs"). Indeed, the burden on Merced is even greater because, like the Amish parents in *Yoder*, he faces criminal prosecution if he engages in conduct essential to his religion. *See* 406 U.S. at 218.[16]

Euless also argues that a burden is not substantial if it is incidental by way of a law of general application. Such an interpretation violates TRFRA's plain language. TRFRA applies to "*any* rule, order, decision, practice, or other exercise of governmental authority." Tex. Civ. Prac. & Rem. Code § 110.002(a) (emphasis added). This broad language does not permit this court to read an exception into the statute for generally applicable laws that incidentally burden religious conduct.

In conclusion, we hold that the Euless ordinances at issue substantially burden Merced's free exercise of religion. We move next to consider the governmental interests Euless advances in their defense.

C.    *Compelling Governmental Interest*

TRFRA places on the government the burden of proving that the burden it created both advances a compelling interest and is the least restrictive means of doing so. Tex. Civ. Prac. & Rem. Code § 110.003(b); *Barr*, 2009 WL 1712798 at *14. Federal decisions interpreting the Free Exercise Clause are relevant to

---

[16] Euless abandoned on appeal its argument made in the district court that Merced's free exercise is not burdened by its ordinances because he could go elsewhere to practice those elements of his religion. The city failed to include this argument in its brief. *See Mosley v. Dretke*, 370 F.3d 467, 474 (5th Cir. 2004).

this inquiry. *Id.* § 110.001(b). These cases have described a compelling governmental interest using phrases such as "of the highest order," *Lukumi*, 508 U.S. at 546, and "paramount," *Yoder*, 406 U.S. at 213.

*Barr* cites with approval the United States Supreme Court's opinion in *Gonzales v. O Centro Espirita Beneficiente Uniao do Vegetal*, 546 U.S. 418 (2006), equating the compelling state interest requirements of RFRA and TRFRA. 2009 WL 1712798 at *13. In *O Centro*, the Supreme Court interpreted RFRA to require "the Government to demonstrate that the compelling interest test is satisfied through application of the challenged law 'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened." 546 U.S. at 430–31. The government cannot rely upon general statements of its interests, but must tailor them to the specific issue at hand: "In [*Sherbert* and *Yoder*], this Court looked beyond broadly formulated interests justifying the general applicability of government mandates and scrutinized the asserted harm of granting specific exemptions to particular religious claimants." *Id.* at 431. The courts' task of balancing the interests is difficult, but the goal is to "strike sensible balances, pursuant to a compelling interest test that requires the Government to address the particular practice at issue." *Id.* at 439.

*Barr* is particularly instructive. There, the City of Sinton advanced the interests of "safety, preventing nuisance, and protecting children" to justify its exclusion of Barr's religious halfway house. 2009 WL 1712798 at *14. The Texas Supreme Court's next sentence is revealing: "But there is no evidence to support the City's assertion with respect to 'the particular practice at issue'—Barr's ministry." *Id.* While not requiring the city to wait for disturbances before taking preventive measures, the court required more than general platitudes to justify the practical exclusion of a religious ministry from the city limits. Thus, for Euless to prevail, it must show by specific evidence that Merced's religious practices jeopardize its stated interests. This it cannot do.

The two interests Euless claims are compelling are public health and animal treatment, the emphasis being on the former. But the parties stipulated to, and the district court found, the following facts:

25. Defendant has no evidence that any of the Plaintiff's religious practices in his home, including the killing of goats, sheep, and turtles, has adversely affected the health of any person.

26. Defendant has no evidence that any of the Plaintiff's religious practices in his home, including the killing of goats, sheep, and turtles, has adversely affected the safety of any person.

27. Defendant has no evidence that the Plaintiff ever disposed in an illegal manner of the remains (dead animals or their parts) of any animal sacrifice in his home.

28. Defendant has no evidence that the Plaintiff ever disposed in an unsanitary manner of the remains (dead animals or their parts) of any animal sacrifice in his home.

29. Defendant has no evidence that the Plaintiff ever kept any goats, sheep, or other animals on his premises for longer than four hours.

30. Defendant has no evidence that the Plaintiff ever kept any goats, sheep, or other animals on his premises in a manner that before the killing caused any injury to any animal.

31. Defendant has no evidence that the Plaintiff ever caused any animal on his premises to suffer any cruelty or harm, other than the killing of the animal.

32. Defendant has no evidence that the Plaintiff ever kept any goats, sheep, or other animals on his premises in an unsanitary manner.

33. Defendant has no evidence that the Plaintiff ever kept any goats, sheep, or other animals on his premises in a manner that denied to any animal sufficient food and water.

34. Defendant has no evidence that any of the Plaintiff's religious practices in his home caused any animal greater suffering than is normal in the legal, commercial slaughter of animals for meat.

In addition, the city's manager admitted that killing livestock would still be illegal in Euless even if it did not present a health hazard, though he considered it "beyond speculation" that these killings presented just such a risk. But it is

undisputed that Merced conducted animal sacrifices for sixteen years in Euless without incident.

In their briefs, the parties dwell at length on the health implications of carcass disposal even though, as noted above, the disposal ordinance is not one that prevents Merced's activities. And the city admits, based on these unchallenged findings, that Merced's method of disposal—placing the remains in dumpters or trash cans after double-bagging them[17]—is both lawful and sanitary. Even including disposal within the ken of activities relevant to Euless's stated interests, the above findings eviscerate any possibility of meeting *Barr's* particularity requirement. The city has absolutely no evidence that *Merced's* religious conduct undermined any of its interests. Euless's experts did testify that the city's interests would be harmed by activities like those Merced performs,[18] but this general testimony does not vitiate the stipulated facts respecting Merced's practice,[19] and the government bears the burden at this stage to prove its interests are harmed. *Cf. O Centro*, 546 U.S. at 428–29 (upholding under RFRA the issuance of a preliminary injunction when the evidence equally supported harm to the plaintiff's religious practice and to the government's asserted interests when the government bore the burden of proof). Again, we are not concerned with keeping, killing, and disposing of animals in the abstract, but with balancing the government's interests with the particular

---

[17] We reiterate that the deposition summary of an Euless witness to the contrary is irrelevant in light of the agreed facts approved by the district court.

[18] One of Euless's experts opined that if the keeping and killing of several dozen animals was "allowed all over the city, it would certainly lower the bar of public health." The only evidence of numbers, however, is that there are five Santeria priests in Euless. The danger of allowing them to sacrifice four-legged animals because everyone in Euless will do it appears, like the report of Mark Twain's death, greatly exaggerated.

[19] *See Barr*, 2009 WL 1712798 at *14 (noting that Sinton failed to cite a single study or experience with halfway houses to justify its ban on them). Here, Euless does not cite any studies or experiences with the Santeria religion in support of its ordinances.

practice at issue. Merced has performed these sacrifices for sixteen years without creating health hazards or unduly harming any animals.

Euless argues that *O Centro* stands for the proposition that the government cannot refuse to exempt one kind of religious conduct when it already exempts a similar kind of religious conduct; that is, it cannot discriminate between similar practices. We note several exceptions that undermine Euless's public health interest regarding the consumption of uninspected meat and disposal of carcases. First, Texas law exempts from inspection requirements the slaughter and consumption of meat for the personal use of the livestock's owner, his family, and his non-paying guests. Tex. Health & Safety Code § 433.006(a). Also, Euless permits hunters to bring dead animals into the city, butcher and consume them, and dispose of the unwanted portions. Such exceptions weaken Euless's asserted interests. *See Lukumi*, 508 U.S. at 546–47 ("Where government restricts only conduct protected by the First Amendment and fails to enact feasible measures to restrict other conduct producing substantial harm or alleged harm of the same sort, the interest given in justification of the restriction is not compelling.").[20]

The city denies that these and other exceptions fall into the same category as allowing a citizen to briefly keep and kill dozens of animals at one time. But the difference is one of degree and not one of kind. The keeping, slaughter, and disposal of a small number of fowl on a regular basis, which Euless permits, over time has the same corrosive effect on the city's interests as infrequent sacrifices

---

[20] Merced also points to various exceptions to Euless's killing ban, including the killing of fowl and vermin, which likewise weaken the city's interests. Even though the city's manager admitted that killing of four-legged animals is not an evil in itself, *see* 7 U.S.C. § 1902(b) (describing the slaughter technique used by Merced, severing the carotid arteries with a sharp instrument, as humane), it is still prohibited.

of a larger number of animals.[21] The city's experts did not explain any public health rationale behind the differing treatments afforded different animals. The ordinances allow the killing of several large fowl, like turkeys, but forbid the killing of even a single goat. Also, a hunter could presumably bring home as many deer as he could legally shoot and butcher them without running afoul of any ordinance.

The balancing of interests is difficult. To carry its burden of proof, a government's asserted interest must be particularly directed to the conduct at issue. In answering this legal question, we are persuaded that, on this record, the scales tip in favor of Merced. Thus, we hold that Euless has failed to assert a compelling governmental interest in support of its ordinances that burden Merced's religious conduct.

## D. Least Restrictive Means

Even if Euless marshaled a compelling governmental interest in its favor, it must also prove that its chosen regulatory method is the least restrictive means of furthering that interest. Euless does not expend much effort on that score, arguing that it does not totally ban the killing of all animals, and thus implements a less restrictive alternative. But it does entirely ban the killing of goats, sheep, and turtles, which is necessary to initiate a Santeria priest. And TRFRA requires the *least* restrictive means, not merely less than a complete ban. *See* Tex. Civ. Prac. & Rem. Code § 110.003(b)(2); *cf. United States v. Playboy Entm't Group, Inc.*, 529 U.S. 803, 813 (2000) ("If a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative.").

Merced proposes no fewer than three less restrictive alternatives to Euless's current scheme. For purposes of illustration, one will do. Euless could

---

[21] Merced testified that he has typically performed sacrifices of four-legged animals about once a year.

create a permit system whereby Santeria adherents comply with conditions designed to safeguard the city's interests (e.g., reasonable limitations on the time the animals can be kept before the killings) and in return are allowed to sacrifice animals as dictated by their religion. Euless does not rebut any of Merced's alternatives; it does not even try. Thus, as an alternative to our holding that Euless failed to identify a compelling interest, we hold that the Euless ordinances that burden Merced's religious free exercise are not the least restrictive means of advancing the city's interests.

### E.    *Attorney Fees*

Euless moved in the district court for an award under 42 U.S.C. § 1988 of its attorney fees incurred in defending this action. Section 1988 allows district courts, in their discretion, to award fees to the prevailing party for actions brought under, among others, 42 U.S.C. § 1983, RLUIPA, and RFRA. § 1988(b). While prevailing plaintiff's are usually entitled to such fees, "prevailing defendants cannot recover § 1988 fees without demonstrating that the plaintiff's underlying claim was frivolous, unreasonable or groundless." *Hidden Oaks Ltd. v. City of Austin*, 138 F.3d 1036, 1053 (5th Cir. 1998). We review the district court's decision for abuse of discretion. *Id.* at 1052.

As is plain from our resolution of the merits, Merced's case is not only non-frivolous, it is meritorious and prevailing. Because Euless is not a prevailing party on the TRFRA claim, it is not entitled to attorney fees under § 1988.[22] The district court granted Euless's motion for summary judgment regarding Merced's RLUIPA claim, but that fact alone does not mean it was frivolous, *id.* at 1053, and Euless offers no additional reasons to deem it so. Thus, we hold the district court did not abuse its discretion in denying Euless's request. Merced did not request attorney fees as allowed by TRFRA, Tex. Civ.

---

[22] Because we do not reach Merced's constitutional claims, we do not discuss attorney fees in relation to them.

Prac. & Rem. Code § 110.005(a)(4), or § 1988 in the district court nor has he requested them on appeal. Accordingly, we do not award any.

### III. CONCLUSION

Because we conclude that Merced is entitled under TRFRA to an injunction preventing Euless from enforcing its ordinances that burden his religious practice of sacrificing animals, *see* Tex. Civ. Prac. & Rem. Code § 110.005(a)(2), we do not reach his claims under the First and Fourteenth Amendments. For the foregoing reasons, we REVERSE the district court's judgment respecting Merced's TRFRA claim, we AFFIRM the district court's denial of attorney fees, and REMAND for further proceedings consistent with this opinion.