# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
July 9, 2010

No. 09-20091

Lyle W. Cayce
Clerk

A.A., by and through his parents and legal guardians, Michelle Betenbaugh and Kenney Arocha; MICHELLE BETENBAUGH, individually; KENNEY AROCHA, individually,

Plaintiffs – Appellees

v.

NEEDVILLE INDEPENDENT SCHOOL DISTRICT,

Defendant – Appellant

Appeal from the United States District Court
for the Southern District of Texas

Before JOLLY, HIGGINBOTHAM, and WIENER, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

A Native American boy and his parents challenge a school district's requirement that he wear his long hair in a bun on top of his head or in a braid tucked into his shirt. We agree with the district court that the requirement offends a sincere religious belief and hold it invalid under Texas law.

No. 09-20091

I

When this dispute began, A.A. was a five-year-old prospective kindergartner whose parents were planning to move to Needville, Texas, a small town located forty-five miles southwest of downtown Houston. The school district in Needville[1] has long had a grooming policy, which, among other things, provides that "[b]oys' hair shall not cover any part of the ear or touch the top of the standard collar in back." The policy's stated design is "to teach hygiene, instill discipline, prevent disruption, avoid safety hazards, and assert authority." In keeping with his Native American religious beliefs, A.A. has never cut his hair, which he has at times kept unbraided, and in one and two braids.

Like most young children, A.A.'s beliefs hitch to those of his parents, Kenney Arocha and Michelle Betenbaugh. Arocha identifies as Native American and both he and his son are members of the state-recognized Lipan Apache Tribe of Texas.[2] While Arocha and Betenbaugh have raised their son according to Native American tenets, Arocha's own religious beliefs have evolved over the years. As a child, Arocha's maternal grandfather and uncle told him that he was Native American, instructed him in certain beliefs, and "gave him tools" to guide him through the day and to help him "better understand his purpose." Arocha

---

[1] Needville Independent School District.

[2] When appellees filed this suit, Arocha's application for membership in the tribe was still pending. Both the appellees' brief and the amicus curiae brief of the Lipan Apache Tribe indicate that application has now been accepted. Though the record on appeal has not been updated to reflect this development, we take the tribe at its word as to administrative matters—such as tribal membership—that are within its unilateral discretion. And, in any event, tribe membership or lack thereof does not materially affect our analysis. *See Frazee v. Illinois Dept. of Employment Sec.*, 489 U.S. 829, 833 (1989) (explaining that "[u]ndoubtedly, membership in an organized religious denomination . . . would simplify the problem of identifying sincerely held religious beliefs," but that a belief is no less sincere just because the individual is not "responding to the commands of a particular religious organization").

No. 09-20091

believes that members of his Native American tribe fled the United States to avoid being placed on reservations, explaining, he suggests, why some in the family, like his mother, identify as Hispanic and practice Catholicism.

Though he too practiced Catholicism and Mormonism at times as he grew older, Arocha began to "reconnect" to his Native American religion and the teachings of his grandfather and uncle more than a decade ago. He believes that his religious values reflect Native American beliefs and are thus connected to his ancestry:

> What I like to do, I like to have reverence every day to understand that at every turn, no matter what it was, no matter what it is that we're doing, something somewhere had to give itself up for us and to understand that and pay close attention to that, in order to respect whatever it was that gave itself up for me.

Arocha explains that his understanding of his religion is a journey and that he continues to research Native American religion and culture on a daily basis and engages in a ritual form of prayer called smudging.

Long hair is part of Arocha's religious beliefs. He wears his hair long, as he did as a young child before he was forced to cut it for school—an experience he describes as "unsettling." His grandfather wore his hair short, but his uncle wore his hair long and in one or two braids. As an adult and over time Arocha came to find religious meaning in wearing his hair long as he gained greater understanding of his grandfather and uncle's teachings. The result is that, as with other aspects of Arocha's religious experience, "something he has been doing for a long time winds up being something that's more significant," and for more than a decade he has seen his long hair as "a symbol, an outward extension of who we are and where we come from, our ancestry and where we're going in

3

No. 09-20091

life" and "a constant reminder to us of who we are." Arocha last cut his hair's *length* about ten or eleven years ago, though he does trim the sides on occasion because of the summer heat. He will not cut his hair's length unless he is mourning for a loved one. An employer once threatened to terminate him if he did not cut his hair, but Arocha refused. And, when he underwent brain surgery a few years ago, he worked with his doctors to keep his long braids.

Arocha and Betenbaugh have passed these familial religious traditions on to their son and so, as we have noted, A.A.'s hair has never been cut. A.A.'s parents have explained to him that his hair is a connection to his ancestors, as well as a reminder of "how long he has been here and an extension of who he is." When others ask about his long hair, A.A. responds that he is Native American. He once refused to wear a wig as part of a Halloween costume because he did not want it to cover his braids. While A.A. "customarily keeps" his hair "in two 13-inch-long braids," he does not always do so.


II

Not yet in Needville, A.A.'s family began planning a move to the town in 2007. In November of that year, Betenbaugh contacted the Needville Independent School District in anticipation of A.A.'s enrollment the following fall.

Betenbaugh first e-mailed Linda Sweeny, the secretary of school superintendent Curtis Rhodes, and asked whether her son's "long hair" would pose a problem in light of the dress code, and what documentation would be

necessary to prove his Native American heritage.[3] Superintendent Rhodes never received the e-mail and Betenbaugh received no response.

Betenbaugh sent a second e-mail in May 2008 to the elementary school's principal, Jeanna Sniffin, asking if A.A.'s "long hair" worn "in accordance with their [Native American] heritage" would pose a problem.[4]  Sniffin responded, "[o]ur dress code in Needville does not allow boy's [sic] hair to touch their ears or go below their collar.  Long hair is not allowed."  Betenbaugh then e-mailed Superintendent Rhodes informing him that A.A. "is Native American and has long hair in accordance with his father's beliefs" and that "[w]e keep his hair clean and neatly braided."

About two weeks later, Rhodes met with A.A.'s parents to discuss the hair length issue.  He requested proof of the family's religious beliefs.  Arocha and Betenbaugh explained that their beliefs were passed down orally, and thus they could not direct him to written documentation.  They did, however, present Rhodes with related legal precedent, a copy of the American Indian Religious Freedom Act,[5] and the results of a 2005 DNA test indicating that Arocha is of Native American descent.  Arocha and Betenbaugh also explained that, according to their beliefs, hair was not to be cut except after life-changing events, characterizing it as "a yardstick of wisdom." They related that A.A.'s decision to

---

[3] Betenbaugh stated in her e-mail: "My four year old son will start school next year at Needville Elementary.  He is of native american [sic] descent and has long hair.  Will this be a problem and what kind of documentation will be needed to prove his heritage?"

[4] The e-mail reads in relevant part: "[M]y husband and therefore my son are of native american [sic] descent.  Both of them have long hair in accordance with their heritage.  Will this be a problem and how will it be addressed?"

[5] 42 U.S.C. § 1996.

No. 09-20091

wear long hair to school was a "personal choice." Superintendent Rhodes denied the exemption request in a written denial letter that gave no explanation for his decision though it provided information on how to appeal his decision to the school board.

The parents did appeal, urging that, "[w]e as parents disagree with Mr. Rhodes' [sic] decision because our son's hair and its length are a sacred part of the belief system we practice. Cutting hair in order to comply with the dress code is not an option."

Local media began to cover the dispute. The *Houston Press* quoted Superintendent Rhodes as saying:

> I've got a lot of friends that are Native Americans . . . and they all cut their hair. We're not going to succumb to everything and just wash away our policies and procedures . . . . If you want to think we're backwards . . . no one is asking you to move to Needville and have these opinions invoked on you.

The school board met to consider the request. Before a "standing room only" crowd, Arocha and Betenbaugh both spoke, as did many members of the Needville community. Superintendent Rhodes then recommended to the board that the family's exemption request be denied as premature since they did not yet live in the district. He had come to this conclusion following his initial meeting with the family, but had not mentioned it to the family until then. The school board agreed with Rhodes's recommendation, even though there was no official policy requiring a child to live in Needville before a dress code exemption could be decided and Rhodes had denied the family's initial request notwithstanding this apparent residency requirement.

No. 09-20091

III

The family accelerated its efforts to move to Needville. The District informed them that mere residency was not enough and that they could only apply for an exemption once A.A. actually enrolled in school. This time the District required the family to complete a newly created "exemption form," which purported to require documentary evidence of the family's membership in "a recognized church or religious organization whose tenets and practices conflict."[6] Using the form, the family responded to the District's objection to long hair, requesting that A.A. be exempted from any policy that "would require him to cut his hair":

> [A.A.] has a sincerely held religious belief—as do many Native Americans—that his long hair is not only an expression of his ancestry and heritage, but also a sacred symbol of his life and experience in this world, and that it should be cut only to mark major life events such as the death of a loved one. [A.A.] has learned these religious beliefs from his father, who shares the same ancestry, heritage, and beliefs.

The exemption form also stated that A.A.'s hair had never been cut. His exemption request pending, A.A. enrolled in Needville Elementary in August 2008, with school set to start in two weeks' time.

Superintendent Rhodes denied the family's second exemption request less than a week later and Arocha and Betenbaugh again submitted an appeal to the

---

[6] This "exemption form," though not specifically at issue here, suffers from its own constitutional difficulties, as the District seems to have acknowledged in a letter to the family's counsel on August 18, 2008. *See, e.g.*, *Frazee v. Ill. Dept. of Employment Sec.*, 489 U.S. 829, 834 (1989) (rejecting "the notion that to claim the protection of the Free Exercise Clause, one must be responding to the commands of a particular religious organization"); *id.* at 831 (rejecting a lower court's requirement that the asserted religious belief "be found in a tenet or dogma of an established religious sect") (internal quotation marks omitted). The District had never before used this exemption form.

No. 09-20091

school board. Their appeal notice indicated that (1) although Arocha had not yet gained membership in a particular Native American tribe, his DNA indicates he is biologically descended from Native Americans; (2) Arocha learned of his heritage through his grandfather and uncle, he believes he is descended from the Lipan Apaches, and he was collecting the required genealogical records to apply for tribal membership; (3) Arocha had not cut his hair for ten years, even risking termination from a job and maintaining his braids during a month-long stay in the hospital; and (4) A.A.'s hair had never been cut.

The school board convened a hearing on the exemption request a few days later. Before the meeting began, Rhodes met privately with the family. It was at this point that Rhodes first learned that Arocha had kept his braids even during brain surgery. Finding this compelling evidence of Arocha's sincerity, Rhodes offered to allow A.A. to wear his hair in a bun on top of his head as a compromise, moving the discussion away from hair length. A.A. and his family rejected the offer.

The school board meeting began in plenary session. The family, who was now represented by counsel, spoke about the facts and the law in support of an exemption. After the family's presentation, the board met in an executive session closed to the public and to the family. In that session, the board consulted with Superintendent Rhodes who urged the adoption of a new exemption that would permit A.A. to wear his hair long "in a tightly woven single braid down his back with the hair behind his ears, out of his eyes and the braid tucked into the collar of his shirt." He had formulated some version of this exemption before his earlier meeting with the family but had not mentioned it to them. The board adopted Rhodes's suggestion.

8

No. 09-20091

The board then returned to the meeting's plenary session, where board member Kim Janke announced the decision to the public. She expressed hesitation: "[a]lthough I disagree with the law presented in this case and understand and support why Mr. Rhodes made the decision that he made, I move that the Board grant the [tucked braid exemption]."

There is no school district policy that prohibits a female student from wearing two braids instead of one, or that requires her to tuck in her long hair. The District has granted the only other religious exemption request it has received to date, allowing a Muslim girl to wear a headscarf.

IV

Prior to the school board meeting, Arocha and Betenbaugh had alerted the school district that they would seek an injunction in federal court and the District had agreed "not to discipline [A.A.] until the soonest of the following occurs, the student receives an injunction to prevent his compliance from the dress code or September 22, 2008." A few days later, the District stated that its understanding of the agreement was that any grace period would only be triggered if the District "did not grant A.A. an exemption by August 20, 2008." Because the District had granted an exemption in some form, in its view no disciplinary grace period was in effect.

When A.A. began kindergarten on August 25 he wore his hair in two long braids. That day, the District informed Arocha and Betenbaugh that A.A. would need to comply with one of the exemptions by September 2 or discipline would be imposed. He did not comply, so on September 3, A.A. was placed in in-school suspension where he received one-on-one instruction and thirty minutes of

No. 09-20091

recess a day. During in-school suspension he was not allowed to socialize with other children.

This continued until the family filed suit and the district court entered a temporary restraining order one month later on October 3, allowing A.A. to return to class and wear his hair as he wanted. Before the district court, the family alleged that the District's policy violates (1) A.A's rights to free exercise of religion under the First and Fourteenth Amendments; (2) similar rights under the Texas Religious Freedom Restoration Act; (3) A.A.'s rights to free expression under the First and Fourteenth Amendments; and (4) Arocha and Betenbaugh's Fourteenth Amendment due process right to raise A.A. according to their Native American religion and heritage. During the litigation and responsive to the bun or tucked braid requirement, Arocha expressed religious significance in braiding his long hair. As the district court found, Arocha "feels that his hair is 'a symbol, an outward extension of who we are and where we come from, our ancestry and where we're going in life.'" The court explained that "[h]e believes that each braid and each plait has a deep meaning" and "that the very act of braiding helps him feel connected to who he is." Arocha says that braids should be worn "in plain sight" and that "each braid has its own significance and . . . that's the way it should be presented."

The family sought declaratory and injunctive relief pursuant to § 1983 and Texas law.[7] The District conceded that A.A. has a right to some form of exemption from its grooming policy, but argued that either of the two proffered options—a single "tightly woven" braid tucked behind A.A.'s shirt or a bun on top of his head—would be legally sufficient. The district court found for the family

---

[7] TEX. CIV. PRAC. & REM. CODE § 110.005.

10

## No. 09-20091

on all four grounds and issued a permanent injunction against the District preventing the grooming policy's application to A.A.[8]  The District timely appealed to this court.

### V

Because we do not decide constitutional claims when a case can be footed on alternative grounds,[9] our analysis begins with state law—specifically, the Texas Religious Freedom Restoration Act.

That act—often abbreviated as TRFRA—prevents any government agency in Texas from "substantially burden[ing] a person's free exercise of religion" unless it "demonstrates that the application of the burden to the person . . . is in furtherance of a compelling governmental interest; and . . . is the least restrictive means of furthering that interest."[10]  While this court under TRFRA "must accept the trial court's fact findings supported by the evidence, the ultimate answers determine the legal rights protected by the Act and are thus matters of law."[11]  "A district court's legal conclusions at a bench trial are reviewed de novo and its findings of facts are reviewed for clear error."[12]

---

[8] *A.A. ex rel. Bettenbaugh v. Needville Indep. Sch. Dist.*, ___ F. Supp. 2d ___, 2009 WL 6318214 (S.D. Tex. 2009).  The parties agreed, pursuant to FED. R. CIV. P. 65(a)(2), to consolidate the trial on the merits with the preliminary injunction hearing.

[9] *Nw. Austin Mun. Util. Dist. No. One v. Holder*, ___ U.S. ___, ___, 129 S. Ct. 2504, 2513 (2009) ("[T]he Court will not decide a constitutional question if there is some other ground upon which to dispose of the case.") (internal marks and citations omitted).

[10] TEX. CIV. PRAC. & REM. CODE § 110.003(a), (b).

[11] *Barr v. City of Sinton*, 295 S.W.3d 287, 299 (Tex. 2009).

[12] *Adkins v. Kaspar*, 393 F.3d 559, 563 (5th Cir. 2004).

No. 09-20091

Texas did not enact TRFRA on a clean slate. The act is a response to a twenty-year federal kerfuffle over the level of scrutiny to apply to free exercise claims under the First Amendment of the United States Constitution. Nine years before TRFRA's enactment, the Supreme Court held, in *Employment Division, Department of Human Resources of Oregon v. Smith*, that the First Amendment's Free Exercise Clause does not inhibit enforcement of otherwise valid laws of general application that incidentally burden religious conduct.[13] Responding to *Smith*, Congress enacted the Religious Freedom Restoration Act of 1993 (RFRA).[14] RFRA expressly adopted the compelling interest test as set forth in a pair of Supreme Court cases,[15] *Sherbert v. Verner*[16] and *Wisconsin v. Yoder*.[17] That test "prohibits '[g]overnment' from 'substantially burden[ing]' a person's exercise of religion even if the burden results from a rule of general applicability unless the government can demonstrate the burden '(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest.'"[18]

As originally enacted, RFRA applied to both federal and state governments, "but notably lacked a Commerce Clause underpinning or a

---

[13] 494 U.S. 872, 874, 890 (1990).

[14] 107 Stat. 1488, 42 U.S.C. § 2000bb *et seq*.

[15] 42 U.S.C. § 2000bb(b)(1).

[16] 374 U.S. 398, 399–402 (1963).

[17] 406 U.S. 205, 221–29 (1972).

[18] *City of Boerne v. Flores*, 521 U.S. 507, 515–16 (1997) (quoting 42 U.S.C. § 2000bb-1; brackets in original).

No. 09-20091

Spending Clause limitation to recipients of federal funds."[19]  In *City of Boerne v. Flores*, the Supreme Court invalidated RFRA as applied to the states and their subdivisions, finding that Congress had exceeded its remedial power under the Fourteenth Amendment to delineate the scope of constitutional violations.[20]

Congress again responded.  This time it enacted the Religious Exercise in Land Use and Institutionalized Persons Act of 2000 (RLUIPA),[21] which "is largely a reprisal of the provisions of . . . RFRA," though "its scope is limited to laws and regulations that govern (1) land use and (2) institutions such as prisons that receive federal funds."[22]

Unhappy with the federal government's solution, thirteen states took matters into their own hands, including Texas, which enacted TRFRA to "provide[] the same protections to religious free exercise envisioned by the framers of its federal counterpart, RFRA."[23]  In other words, TRFRA provides protections to religious freedom "in addition to the protections provided under federal law" and the Texas and United States constitutions.[24]  Because TRFRA and its federal cousins—RFRA and RLUIPA—"were all enacted in response to *Smith* and were animated in their common history, language and purpose by the

---

[19] *Cutter v. Wilkinson*, 544 U.S. 709, 715 (2005).

[20] 521 U.S. at 532–36.

[21] Pub. L. No. 106-274, § 7, 114 Stat. 803, 806 (2000) (codified at 42 U.S.C. § 2000bb-2(1)–(2) (2006)).

[22] *See Adkins*, 393 F.3d at 657.

[23] *Merced v. Kasson*, 577 F.3d 578, 587 (5th Cir. 2009) (citing *Barr*, 295 S.W.3d at 296).

[24] TEX. CIV. PRAC. & REM. CODE § 110.009(b).

## No. 09-20091

same spirit of religious freedom," Texas courts "consider decisions applying the federal statutes germane in applying the Texas statute."[25]

Last year, in *Barr v. City of Sinton*, the Texas Supreme Court applied TRFRA for the first time.[26] *Barr* centered on a local pastor who ran a religious halfway house to help non-violent offenders reenter society. The halfway house was "religious" in part because applicants were required to sign a statement of Christian faith and agree to a list of "biblical guidelines for Christian living."[27] The pastor sued in state court after the city in which he lived passed zoning ordinances effectively banning halfway houses altogether.[28] Justice Hecht, writing for the Texas Supreme Court, concluded that the city's ordinance violated TRFRA.

Justice Hecht also set out the statutory text in four familiar elements. To succeed on a claim under TRFRA, a plaintiff must demonstrate (1) that the government's regulations burden the plaintiff's free exercise of religion and (2) that the burden is substantial. If the plaintiff manages that showing, the government can still prevail if it establishes that (3) its regulations further a compelling governmental interest and (4) that the regulations are the least restrictive means of furthering that interest.[29]

---

[25] *Barr*, 295 S.W.3d at 296.

[26] *Id.*

[27] *Id.* at 290.

[28] *Id.* at 291–92.

[29] *Merced*, 577 F.3d at 588 (citing *id.* at 300). *See also* TEX. CIV. PRAC. & REM. CODE § 110.003(a), (b); *Barr*, 295 S.W.3d at 307 ("Although TRFRA places the burden of proving a substantial burden on the claimant, it places the burden of proving a compelling state interest on the government.").

No. 09-20091

VI

To succeed in their TRFRA claim, then, A.A. and his parents must first outline the scope of A.A.'s "free exercise of religion."  TRFRA defines "free exercise of religion" as "an act or refusal to act that is substantially motivated by sincere religious belief."[30]  In examining a putative religious belief under TRFRA, "it is not necessary to determine that the act or refusal to act is motivated by a central part or central requirement of the person's sincere religious belief."[31]  "Not only is such a determination unnecessary, it is impossible for the judiciary."[32]

The district court found that A.A. and Arocha "have a sincerely held belief that their hair should be worn long."[33]  The family contends that this finding recognized a belief in wearing hair *visibly* long.  The District agrees that A.A. has a sincere religious belief in leaving hair *uncut*, but argues that the evidence demonstrates that there is no sincere belief in wearing hair visibly long, essentially that the District can require him to wear his uncut hair in ways that

---

[30] TEX. CIV. PRAC. & REM. CODE § 110.001(a)(1).

[31] *Id.*

[32] *Barr*, 295 S.W.3d at 300.

[33] The family's expert, Dr. James Riding In, testified that Native Americans were historically forced to conceal their beliefs in order to protect themselves from persecution.  In the late nineteenth and early twentieth centuries, the United States imposed assimilationist policies, which "sought to stamp out the traditional spirituality of the Indian people" and subjected Native American children to "forced haircuts."  At the same time, federal regulations "criminalized Indian spirituality."  Dr. Riding In testified that Arocha's experience is not uncommon; because of the attempts at forced assimilation, Native Americans are not always aware that they are even Native American, and many are only now attempting to reclaim their lost religion and culture.  Like Arocha and A.A., other Native Americans attach religious significance to both wearing hair long and only cutting hair for certain reasons because "[t]hey feel long hair is an expression of their spirituality."

15

best conform his appearance to that of male students who cut their hair to meet dress code requirements.[34] We focus on A.A.'s putative religious belief in wearing his hair in a manner that does not conceal its expressive length.

As a starting point, the District concedes that some Native Americans keep their hair long and in braids as a tenet of their sincere religious beliefs.[35] It instead emphasizes the fact that other Native Americans fasten their long hair in buns or otherwise obscure their hair so that it is not visibly long. If those Native Americans can comply with their religious beliefs in that way, the District asserts that A.A. can, too.

"The Fifth Circuit has had few occasions to conduct this part of the inquiry, as the sincerity of a religious belief is not often challenged."[36] When sincerity is challenged, though, courts are reticent to draw the sort of line the

---

[34] This has not always been the District's position. As Superintendent Rhodes explained at the second board meeting, he did "not believe" at the time "that the mere statement that 'many Native Americans' subscribe to this belief is sufficient to merit an exemption for [A.A.]. Nowhere in the exemption does A.A. claim a certain tribal heritage, nor is it clear whether a particular or heritage subscribes to a religious belief centered around the cutting of one's hair."

[35] *See Diaz v. Collins*, 114 F.3d 69, 72 (5th Cir. 1997) (recognizing the "strong significance of long hair in Native American belief"); *id.* at 73 n.18 ("The record reveals that the Native America custom regarding long hair, while in some part cultural, has strong religious implications. Hair is only supposed to be cut as a sign of grieving for the recently dead, and shorn locks are often placed with the deceased so that they may be carried into the afterlife."); *Teterud v. Burns*, 522 F.2d 357, 360–61 (8th Cir. 1975) (Native American inmate's belief that hair should be kept long was sincerely held religious belief under First Amendment); *Alabama & Coushatta Tribes v. Trustees of Big Sandy Indep. Sch. Dist.*, 817 F. Supp. 1319, 1326 (E.D. Tex. 1993) (Native American students' belief that hair should be kept long was sincerely held religious belief under First Amendment); *Gallahan v. Hollyfield*, 516 F. Supp. 1004, 1006 (E.D. Va. 1981), *aff'd*, 670 F.2d 1345 (4th Cir. 1982) (Native American inmate's belief that hair should be kept long was sincerely held religious belief under First Amendment).

[36] *McAlister v. Livingston*, 348 F. App'x 923, 935 (5th Cir. Oct. 6, 2009) (unpublished).

No. 09-20091

District now requests.  In *Thomas v. Review Board of Indiana Employment Security Division*,[37] Thomas, a Jehovah's Witness, had requested a layoff from his manufacturing job and unemployment benefits after being transferred to a foundry that supplied military armaments because the work violated his religious principles.[38]  The Indiana Supreme Court called the choice a "personal philosophical" one, citing inconsistencies in the plaintiff's explanation of his beliefs, his practice of them, and the fact that other Jehovah's Witnesses testified that working on armaments was "scripturally acceptable."[39]  The Supreme Court reversed, explaining that when a plaintiff draws a line, "it is not for the Court to say it is an unreasonable one."[40]

*Thomas* made plain that "the guarantee of free exercise is not limited to beliefs which are shared by all of the members of a religious sect."[41]  This insight recognizes that "[i]ntrafaith differences . . . are not uncommon among followers of a particular creed," and that "the judicial process is singularly ill equipped to resolve such differences."[42]  The District's proffered anecdote—that other Native Americans do not do as A.A. does—is thus unpersuasive in our analysis, no matter how true.   Sincere religious belief cannot be subjected to a judicial sorting of the heretical from the mainstream—certainly not in discharge of duty

---

[37] 450 U.S. 707 (1981).

[38] *Id.* at 710–11.

[39] *Id.* at 715.

[40] *Id.*

[41] *Id.* at 715–16.

[42] *Id.*

17

to faithfully apply protections demanded by law.[43] Efforts to that end would put at risk the protection that the First Amendment and TRFRA are meant to provide.

*Thomas* does not, however, "relieve a complaining adherent of the burden of demonstrating the honesty and accuracy of his contention that the religious practice at issue is important to the free exercise of his religion."[44] On this score, the District argues that A.A. and his parents have put forth shifting explanations of A.A.'s religious belief, first focusing on the cutting of hair and then later on not concealing its expressive length.

We disagree. Despite the family's articulation of religious belief using different words at different times, we must refuse to dissect religious tenets just "because the believer admits that he is 'struggling' with his position or because his beliefs are not articulated with the clarity and precision that a more sophisticated person might employ."[45] In this case, focusing on evidence of a "struggle" and limiting A.A.'s religious belief to the cutting of hair would disregard the salient thrust of the family's statements of belief from the very beginning and ignore the sequence of the District's suggestions to which they were responding. The family's first three contacts with the District explained that A.A. has "long hair" because of his Native American heritage, and one of these e-mails noted that his hair is kept "clean and neatly braided." The family has not limited themselves to that belief, but consistently maintained—as they explained in their second appeal notice to the school board—that it is the belief

---

[43] *See id.* at 716 ("Courts are not arbiters of scriptural interpretation.").

[44] *Adkins*, 393 F.3d at 570.

[45] *Thomas*, 450 U.S. at 715.

in "long hair" as "an expression of [A.A.'s] ancestry and heritage" that matters.[46] A.A. once refused to wear a Halloween costume because it would cover his braids, and he and his father have both worn their hair in two braids outside their shirts at every meeting with school officials.

While both the family's request for exemption and the District's requirements can be seen as shifting over time, we see no calculated gamesmanship by either of them because "[n]ot surprisingly, the record . . . was not made with an eye to the microscopic examination often exercised in appellate judicial review."[47]  An adherent's religious beliefs are not rendered insincere merely because he articulates them differently in response to shifting objections. An applicant seeking religious exemption is not obliged to provide an accounting of his beliefs, warrant it as final, and then when subject to public disbelief, refrain from speaking up to clarify to others who do not share his faith.  In sum, we do not look to efforts to better explain religious beliefs with exacting incredulity, unless there is reason to do so.  Nor do we see the District's shifts over the course of the controversy to be evidence of bad faith.  A lawsuit of this ilk is a struggle for all concerned.  The exchanges of the parties ultimately sharpened the intersection of regulation and belief.

Even assuming that the difference between protected wearing of hair uncut and wearing it visibly long transcends the semantic, A.A. and his parents

---

[46] The District urges that the family's counsel conceded at trial that any Free Exercise claim was limited to the cutting of hair.  Whatever the meaning of the stray comment, it is plain from our reading of the record that counsel made no such concession.  In fact, counsel for the family directly stated at trial that because the policy and exemptions would "hide the length of A.A.'s hair, which is a symbol of his religious beliefs . . . it is also violative of his free-exercise rights."

[47] *Thomas*, 450 U.S. at 716.

No. 09-20091

have met their burden.  On the facts of this case and in light of the longstanding judicial shyness with line drawing, we decline to confine A.A.'s religious belief to the cutting of hair but instead agree with the district court that he has demonstrated a sincere religious belief in wearing his hair uncovered—*visibly* long.

The district court found that A.A. believes that his "hair should be worn long," and our use of the word "visibly" to describe A.A.'s belief is consistent with the fairest reading of that finding.[48]  The word "worn" is, after all, the past participle of "wear," which means "to bear or have on the person," to "exhibit," or to "present."[49]  And concealing the long hair frustrates its expression.[50]

---

[48] Contrary to the dissent's characterization, the district court repeatedly referred to a religious belief in wearing hair long.  *See, e.g.*, *A.A.*, 2009 WL 6318214, at *8 ("The Court must therefore consider whether Plaintiffs have a sincerely held religious belief that hair should be worn long."); *id.* at *9 ("Plaintiff Arocha claims to follow the Native American religious practice of wearing his hair long except when mourning a loved one."); *id.* at *11 ("The Court therefore finds that Plaintiffs Arocha and A.A. have a sincerely held belief that their hair should be worn long."); *id.* at *12 ("The School Board's exemption policy burdens A.A.'s significantly held religious belief that his hair should be worn long."); *id.* at *13 ("Even though the School Board found it necessary to grant A.A. a religious exemption, it did not extend him this same freedom to wear his long hair in a comfortable, practical manner.").

[49] MERRIAM WEBSTER'S COLLEGIATE DICTIONARY 1338 (10th ed. 1996).

[50] The district court recognized this expressive component when it stated that "[t]he policy"—referring specifically to the "tucked braid" exemption—"will deny A.A. the opportunity to express a religious practice that is very dear to him and his father."  *A.A.*, 2009 WL 6318214, at *12.  In support of this statement, the district court cited a case rejecting a dress code exemption that required students to *wear rosaries under their shirts* because it burdened "a sincere expression of their religious beliefs."  *Id.* (citing *Chalifoux*, 976 F. Supp. at 667) (internal quotation marks omitted); *see Chalifoux*, 976 F. Supp. at 670 (finding the students held a sincere religious belief in "wearing a rosary as a necklace").  The district court also noted, in considering whether A.A.'s religious belief was substantially burdened, that "[f]emale children attending [the school district] are *allowed to wear their long hair exposed and in two braids*, for purely secular reasons.  Even though the School Board found it necessary to grant A.A. a religious exemption, it did not extend him this *same freedom* to wear his long hair in a comfortable, practical manner."  *A.A.*, 2009 WL 6318214, at *12 (emphasis added).  Later the

No. 09-20091

The district court had "no difficulty finding that some Native American communities assign religious significance in hair length," and that Arocha had shown "that he himself has these 'deeply held religious beliefs.'" Arocha had made this showing, the court concluded, not only because he "has not cut his hair in ten to eleven years" and "[h]is long hair addresses 'fundamental' and 'ultimate' concerns," but because "[h]e describes his hair as 'an outward extension of who we are and where we come from, our ancestry and where we're going in life.'"[51] This echoes the district court's undisputed findings of fact, which we repeat once again: "[w]hen people ask A.A. why he has long hair, he tells them it is because he is Native American"; "people ask [Arocha] whether he is Native American, and he tells them that he is"; "[w]hen Plaintiff Betenbaugh bought A.A. a wig as part of a Halloween costume, he refused to wear it because he did not want to cover his braids";[52] the family's written exemption request "stated that 'A.A. has a sincerely held religious belief—as do many Native Americans—that his long hair is not only an expression of his ancestry and heritage, but also a sacred symbol of his life and experience in this world.'"[53]

_____

court explained again that—in contrast to A.A.—"female students are allowed to wear their long hair exposed and in two braids." *Id.* at *14.

[51] *Id.* at *11.

[52] The district court made each of these findings under the heading "I. Findings of Fact," "A. Plaintiffs' Religious Beliefs." *Id.* at *1–2.

[53] The district court made this finding under the heading "I. Findings of Fact," "B. Plaintiff A.A.'s Enrollment in Needville Independent School District." *Id.* at *4.

No. 09-20091

Although *Thomas* may support the conclusion that the scope of A.A.'s sincere religious belief includes its braiding, we need not decide that question as the District does not prohibit the braiding of his hair.[54]

VII

Having demonstrated a sincere belief in wearing visibly long hair, the family must also show that the District's policy and proffered exemptions will substantially burden A.A.'s free exercise of that belief.[55]  Under TRFRA, a burden is substantial if it is "real vs. merely perceived, and significant vs. trivial"—two limitations that "leave a broad range of things covered."[56]  The focus of the inquiry is on "the degree to which a person's religious conduct is curtailed and the resulting impact on his religious expression," as "measured .

---

[54] As we explain further below, the school has not seriously attempted to instruct whether A.A.'s long and visible hair must be braided, rather it instructs that it be in a bun or tucked inside his shirt if braided.

[55] To that end, the family urges we adopt for TRFRA the approach we follow in RLUIPA cases.  We crafted our RLUIPA standard in *Adkins v. Kaspar*, a prisoner case in which we held that regulation creates a "substantial burden" if it "truly pressures the adherent to significantly modify his religious behavior and significantly violates his religious beliefs."  393 F.3d at 570 (defining the term in the analog context of RLUIPA); *see also Merced*, 577 F.3d 578 (quoting the *Adkins* rule in the TRFRA context); *Barr*, 295 S.W.3d at 296 (endorsing the use of federal case law interpreting RLUIPA in TRFRA cases).  Under *Adkins*, a regulation's effect is "substantial" when it either (1) influences the adherent to act in a way that violates his religious beliefs or (2) forces the adherent to choose between, on the one hand, enjoying some generally available, non-trivial benefit, and on the other hand, following his religious beliefs.  *Adkins*, 393 F.3d at 570.  Applying *Adkins*, the district court held that the District's policy burdens A.A.'s religious belief in wearing his hair long.  Since the district court entered its order, however, the Texas Supreme Court in *Barr* declined to explicitly adopt the *Adkins* test in favor of its own, more skeletal framework, though it cited *Adkins* favorably.  *Barr*, 295 S.W.3d at 301.

[56] *Barr*, 295 S.W.3d at 301.

No. 09-20091

. . from the person's perspective, not from the government's."[57] This inquiry is "case-by-case" and "fact-specific"[58] and must take into account "individual circumstances."[59]

A

From federal precedent, we know that "at a minimum, the government's *ban* of conduct sincerely motivated by religious belief substantially burdens an adherent's free exercise of that religion."[60] When conduct is subject to an outright ban, "alternative accommodations do not alter 'the fact that the rituals which [the adherent] claims are important to *him*—without apparent contradiction—are now completely forbidden.'"[61] This federal view matches *Barr*'s instruction that "a burden on a person's religious exercise is not insubstantial simply because he could always choose to do something else."[62] In that case, the Texas Supreme Court had "no hesitation" in holding that prohibiting a pastor from operating his halfway house within city limits was a "substantial burden" on the pastor's free exercise of religion.[63]

---

[57] *Id.*

[58] *Merced*, 577 F.3d at 588 (citing *Barr*, 295 S.W.3d 296, 301–02) (internal citations omitted).

[59] *Barr*, 296 S.W.3d at 308.

[60] *Merced*, 577 F.3d at 590 (examining Supreme Court cases).

[61] *Newby v. Quarterman*, 325 F. App'x 345, 351 (5th Cir. Apr. 30, 2009) (unpublished) (quoting *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 333 (5th Cir.2009)) (emphasis in *Sossamon*).

[62] *Barr*, 295 S.W.3d at 302.

[63] *Id.*

No. 09-20091

Requiring A.A. to cut his hair—a total ban of conduct—would also likely constitute a substantial burden.[64]  But that is not what the District's proposed exemptions require so the bar is incomplete.  Whereas forceably cutting his hair would limit his free exercise at all times, the exemptions permit the District to control A.A.'s hair only while he is at school.  At home he may wear his hair however he likes.

When a restriction is not completely prohibitive, Texas law still considers it substantial if "alternatives for the religious exercise are severely restricted."[65]  Together with *Barr*'s other prescriptions, that means a burden imposing a less-than-complete ban is nonetheless substantial if it curtails religious conduct and impacts religious expression to a "significant" and "real" degree.[66]  Here, that standard is met.

B

First, the burden on A.A. is significant.  The exemptions place a direct burden on A.A.'s religious conduct and expression by, as the district court put it,

---

[64] Under RFRA, we explained that a prison's grooming regulations "legitimately may be deemed to work" a substantial burden on a Native American's religious practice by preventing him from wearing long hair as required by his religion. *Diaz*, 114 F.3d at 72–73. We nonetheless upheld the regulations because they furthered a compelling state interest. *Id.* at 73. *See also Longoria v. Dretke*, 507 F.3d 898, 903 (5th Cir. 2007) (finding a genuine issue of material fact as to the same "substantial burden" question under RLUIPA). The District distinguishes *Diaz* by noting that the policy on its face does not require that A.A. cut his hair, nor does the policy as modified by the exemption; instead, the policy as applied to A.A. requires that long hair be tied in a bun or placed in one braid and worn under a shirt. It is not clear from *Diaz* whether the prisoner was in jeopardy of a haircut or would have been allowed to keep his long hair but with other restrictions on how he could wear it.

[65] *Barr*, 295 S.W.3d at 305; *see also Merced*, 577 F.3d at 590 (quoting *id.*).

[66] *Barr*, 295 S.W.3d at 301.

"deny[ing] A.A. the opportunity to express a religious practice that is very dear to him and his father." While the District's policy and exemptions do not completely bar A.A.'s free exercise, the bar is complete in the sense that he cannot wear his hair visibly long at all during the school day, a critical period of time in a young child's development.[67] The stricture will define his days as a student. As other courts have recognized in analogous contexts, depriving children of religious exercise during the school day is a significant burden. In *Cheema v. Thompson*, a RFRA case, the Ninth Circuit found a substantial burden because a school regulation prevented Sikh children from bringing ceremonial knives to school, despite the school's agreement to allow shorter knives riveted to their sheaths.[68] Likewise, the Southern District of Texas, in *Chalifoux v. New Caney Independent School District*, found a sufficient burden to support a free exercise claim when Catholic students were required to wear

---

[67] In *Diaz*, we held that a Native American prisoner had failed to demonstrate that prison regulations preventing him from wearing a medicine pouch and headband for up to two hours a day worked a substantial burden because "[n]othing in the record" suggested that the prisoner's beliefs, "however fervently held, compel him to wear a medicine pouch or headband at all times[.]" 114 F.3d at 72. As this statement suggests, our focus in that RFRA case was twofold: first, we asked whether the beliefs "compel[led]" the prisoner's religious conduct and then we questioned whether the belief was a "central tenet." *Id.* The Texas Supreme Court has disavowed the former inquiry, *Barr*, 295 S.W.3d at 301, while TRFRA itself expressly forbids the latter. TEX. CIV. PRAC. & REM. CODE § 110.001(a)(1). And, while that is enough to distinguish that case from this one, there are of course factual differences, too: A.A. is a school child not an adult prisoner, the length of his deprivation is longer and at a more critical part of the day, and his religious belief is attached to his person, not an object.

[68] 67 F.3d 883, 885 (9th Cir. 1995) (unpublished) (holding that a school's ban on ceremonial knives worn by some Sikhs violated RFRA). Though agreeing on the issue of substantial burden, one judge dissented from the majority's holding that the school had failed to demonstrate a compelling interest. *Id.* at 889 (Wiggins, J., dissenting) (agreeing with the majority on the issue of substantial burden stating "[i]t is clear that the District's no-knives policy, even with the District's suggested compromises, substantially burdens free exercise of their religion").

No. 09-20091

their rosaries under their shirts.[69]  In the present case, because the District's exemptions directly regulate a part of A.A.'s body and not just a personal effect—like a knife or a rosary—the burden on A.A.'s religious expression is arguably even more intrusive.

The exemptions would also indirectly burden A.A.'s religious conduct and expression.  If A.A. complies with either of them, he will stand out as someone subject to official stigma.  If he does not, he will be exposed to punishment.  The district court believed these "terms of existence" would force A.A. to choose between attending Needville public schools and following his religious beliefs.

C

Not only is the burden on A.A. significant, it is real.  As the district court found, A.A. has already recognized that he has been treated differently because of his hair.  And, given that A.A. understands that his hair is part of the practice and expression of his Native American beliefs, the obvious lesson is that he is being treated differently because of his religion.  This recognition risks feelings of shame and resentment, a risk that, while real now, will continue to grow. A.A. will also be subject to constant threat of punishment should his hair fall out of a bun, or escape his shirt.  This threat is real.

---

[69] 976 F. Supp. 659, 671 (S.D. Tex. 1997) (relying on *Yoder*'s "undue burden" formulation).

No. 09-20091

VIII

"To say that a person's right to free exercise has been burdened, of course, does not mean that he has an absolute right to engage in the conduct."[70] TRFRA permits the regulation of free exercise if the government can establish a compelling interest that justifies the burden,[71] and that it has adopted the least restrictive means of achieving that interest.[72] "Because religious exercise is a fundamental right . . . justification can be found only in 'interests of the highest order.'"[73]

On these counts, the District's amicus, the Texas Association of School Boards Legal Assistance Fund takes the lead. The Fund argues that the District's grooming policy is supported by five goals: to teach hygiene, instill discipline, prevent disruption, avoid safety hazards, and assert authority. The Fund relies on a handful of Texas cases that find these interests sufficient to overcome challenges to student and teacher dress codes. From this precedent, the Fund would extract a principle that "maintaining order in a school [is] a

---

[70] *Barr*, 295 S.W.3d at 305 (quoting *Smith*, 494 U.S. at 894 (O'Connor, J., concurring in the judgment)) (internal quotation marks omitted).

[71] *Id.* at 306.

[72] TEX. CIV. PRAC. & REM. CODE § 110.003(a), (b); *see also Boerne*, 521 U.S. at 534 (RFRA). TRFRA does include an exception to its least restrictive means requirement, allowing a government agency to remedy a substantial burden on free exercise using "narrowly tailored" means to remove that burden. TEX. CIV. PRAC & REM. CODE § 110.003 (d)(2). The District contends that its proposed exemptions are two such "remedies" and thus the District need only demonstrate they are "narrowly tailored" to their interest. This argument is misplaced. Narrowly tailored means must in any event "cure[]" the substantial burden. *Id.* at § 110.003 (d)(3). As we have seen, the proposed exemptions are not remedies at all because they do not remove the substantial burden on A.A.'s free exercise. TRFRA's remedial exception does not apply to the District's half measures.

[73] *Barr*, 295 S.W.3d at 306 (quoting *Yoder*, 406 U.S. at 215).

compelling state interest" that always justifies hair and clothing regulation no matter the constitutional interest. This principle is not the law.

While the advanced scholastic concerns are no doubt legitimate,[74] the Fund's argument suffers from two critical defects. Most important, none of the decisions on which the Fund relies considered a challenge to a school regulation that merits strict scrutiny—as A.A.'s challenge under TRFRA plainly does. The Fund identifies lawsuits asserting a student's interest in liberty under the due process clause of the Fourteenth Amendment;[75] the right to be free from discrimination based on gender under federal law's Title VII,[76] under the equal protection clause of the Fourteenth Amendment,[77] and under state-law equal protection provisions;[78] and the right to free expression under the First Amendment.[79] These challenges did not require the government to demonstrate a compelling interest as the District must do here. Rather, we upheld each of

---

[74] We have held, for example, that "interests in the health, safety, and order of public schools are sufficient government interests" to justify inroads into a student's free expression right to choose his own clothing, *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 286 (5th Cir. 2001), and his own hairstyle, *Karr v. Schmidt*, 460 F.2d 609, 614 (5th Cir. 1972).

[75] *See Domico v. Rapides Parish Sch. Bd.*, 675 F.2d 100, 101 (5th Cir. 1982); *Karr*, 460 F.2d at 616; *Ferrell v. Dallas Indep. Sch. Dist.*, 392 F.2d 697, 703 (5th Cir. 1968); *Barber v. Colo. Indep. Sch. Dist.*, 901 S.W.2d 447, 449–51 (Tex. 1995).

[76] *See Willingham v. Macon Tel. Publ'g Co.*, 507 F.2d 1084 (5th Cir. 1975).

[77] *See Karr*, 460 F.2d at 616.

[78] *See Board of Trustees of Bastrop Indep. Sch. Dist.*, 958 S.W.2d 365, 368 (Tex. 1998) (construing "a statute that relates to, but stands independent of, the Equal Rights Amendment to the Texas Constitution"); *Barber*, 901 S.W.2d at 449–51 (rejecting a challenge under the Texas Constitution's Equal Rights Amendment).

[79] *See Karr*, 460 F.2d at 614; *Ferrell*, 392 F.2d at 702; *Barber*, 901 S.W.2d at 449–51.

the challenged regulations if they reflected a "rational determination,"[80] or if they were not "arbitrary" or "unreasonable."[81]  Such determinations answer questions far different than the one we examine today.  The District cannot parlay what may qualify as sufficient to meet rational basis scrutiny into an interest compelling enough to justify a substantial burden upon sincere religious exercise.  After all, Texas applied the compelling interest standard to free exercise claims—the "most demanding test known to constitutional law"[82]—for a reason.  Critically, TRFRA reaches behind *Smith* to a jurisprudence that did not allow a rule of general applicability to demand conformity of conduct enjoying constitutional protection.

Nor, as the Fund suggests, are we obliged to take a school's asserted interests at face value without further examination.  It is true that, because "[e]ducators have an essential role in regulating school affairs and establishing appropriate standards of conduct,"[83] it is "[s]chool boards, not federal courts" who have the "authority to decide what constitutes appropriate behavior and dress in public schools."[84]  But under TRFRA, when it is a student's free exercise of religion at stake, a school's invocation of general interests, standing alone, is not enough—a showing must be made with respect to the "particular practice" at

---

[80] *See, e.g.*, *Domico*, 675 F.2d at 102–03.

[81] *See, e.g.*, *Ferrell*, 392 F.2d at 702.

[82] *Boerne*, 521 U.S. at 534 (RFRA).

[83] *Canady v. Bossier Parish Sch. Bd.*, 240 F.3d 437, 441 (5th Cir. 2001) (citing *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 681 (1986)).

[84] *Id.* (citing *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 267 (1988)).

No. 09-20091

issue.[85]  A court "must searchingly examine the interests that the State seeks to promote . . . and the impediment to those objectives that would flow from recognizing the claimed . . . exemption."[86]  For government to prevail, then, it cannot rely on "general platitudes," but "must show by specific evidence that [the adherent's] religious practices jeopardize its stated interests."[87]  In *Barr*, this method of review meant a municipality's purported interest in "safety, preventing nuisance, and protecting children" could not justify its exclusion of the religious halfway house in the absence of evidence related to the religious ministry and the house itself.[88]

Here, the District makes only cursory attempts to translate the abstract goals of its grooming policy into an interest sufficiently compelling to justify requiring a Native American kindergartner to confine his hair to a bun or to a braid tucked behind his shirt.  In the words of *Yoder*, one of the two Supreme Court decisions on which TRFRA's compelling interest test is based, the District has failed "to show with more particularity how its admittedly strong interest . . . would be adversely affected by granting an exemption" to A.A.[89]

---

[85] *Barr*, 295 S.W.3d at 306 (quoting *Gonzales v. O Centro Espírita Beneficente União Do Vegetal*, 546 U.S. 418, 439 (2006)).

[86] *Yoder*, 406 U.S. at 213, 221.

[87] *Merced*, 577 F.3d at 592 (citing *Barr*, 295 S.W.3d at 306–07).

[88] *Barr*, 295 S.W.3d at 307.

[89] *Yoder*, 406 U.S. at 236.  *See also O Centro*, 546 U.S. at 431 (quoting *id.*).

No. 09-20091

A

We can quickly discard hygienic concern: the District does not dispute that A.A.'s hair is kept clean, nor does it explain why its "one braid down the back" exemption would foster hygiene as compared to two braids.

Safety concerns are insufficient, too. The hazard of long hair in an elementary school setting does not rise to the level of, say, the danger posed by the wearing of insecurely fastened yarmulkes by Orthodox Jews during high school basketball games, a situation examined by the Seventh Circuit nearly thirty years ago.[90] And, as Judge Posner found, even that danger was "not great" (though "not wholly trivial either").[91] Moreover, to say the District's safety concerns are not compelling, we need not go so far as a divided Ninth Circuit panel did in *Cheema v. Thompson*. There, the panel majority held under RFRA that a school did not have a compelling interest in a wholesale ban on ceremonial knives worn by some Sikhs.[92] The court remedied the violation by crafting an exemption that allowed the knives in slightly modified form.[93] To the extent A.A.'s long hair poses a cognizable safety concern, it is of course far from those associated with a knife of any size or shape.

Any risk of disruption and its potential degree are less readily predicted. While there is evidence that A.A. has twice been mistaken for a girl while at school, there is no indication that these occasional cases of mistaken gender identity were disruptive and certainly not such to constitute a compelling

---

[90] *Menora v. Ill. High Sch. Assoc.*, 683 F.2d 1030, 1035 (7th Cir. 1982).

[91] *Id.*

[92] *Cheema*, 67 F.3d at 885.

[93] *Id.*

No. 09-20091

interest; the confusion was easily resolved and the District did not even bother informing his parents when a misunderstanding did arise.

The district court did find that A.A.'s hair "sometimes falls in his eyes and his teacher has to tell him to tuck it behind his ear," but explained that the teacher occasionally has to make the same suggestion to girls and A.A.'s presence has not interfered with the teacher's ability to teach. The District provides no argument or evidence to the contrary.

In fact, the District concedes that the lone religious exemption it has granted in the past—to a Muslim girl who wished to wear a headscarf—permitted the exempted student to look different than the other students, posed no threat of disruption to the school, and did not give rise to any concern that the student would be bullied or teased. The most the District can muster in this space, then, is that a bun or a tuck will present about the same potential for disruption as allowing A.A. to wear long hair in other ways.

B

We are left then with the District's stated interests in instilling discipline and asserting authority. To this list, Superintendent Rhodes would add one last concern, explaining that in crafting the "tucked braid" exemption, he did not necessarily seek to effect the goals of the grooming policy at all, but to "try to have [A.A.'s] hair resemble the rest of the student body in Needville."

Under the compelling interest test, the District's support for these concerns quickly dissolves. For one, the District has failed to put forth a single case in which a school's interests in discipline, authority, and uniformity have proved enough when subject to strict scrutiny. Yes, courts, including the Supreme Court, have found similar interests sufficient—under varying levels of

32

No. 09-20091

scrutiny—to override an adherent's right to a religiously informed appearance in different circumstances.  But, when applying a compelling interest standard, "[c]ontext matters."[94]

Context matters, for example, when members of the military ask the federal government to accommodate their religious practices.  In *Goldman v. Weinberger*, a divided Supreme Court rejected an Orthodox Jew's Free Exercise challenge to an Air Force regulation prohibiting the wearing of headgear—including Judaism's yarmulkes—while indoors.[95]  Emphasizing the deference owed to military judgments when the need to "foster instinctive obedience, unity, commitment, and esprit de corps" is at stake, the court relied on a low threshold of constitutional protection: "The desirability of dress regulations in the military is decided by the appropriate military officials, and they are under no constitutional mandate to abandon their considered professional judgment."[96]  At the same time, in a military community, "there is simply not the same [individual] autonomy as there is in the larger civilian community."[97]  Under this standard, the Court found the headgear regulation to "reasonably and evenhandedly regulate dress in the interest of the military's

---

[94] *Cutter*, 544 U.S. at 723 (quoting *Grutter v. Bollinger*, 539 U.S. 306, 327 (2003)) (brackets in original).

[95] 475 U.S. 503, 508–10 (1986).

[96] *Id.* at 507–08.

[97] *Id.* at 507.

No. 09-20091

perceived need for uniformity," even if that meant burdening the free exercise of religion.[98]

Context matters, too, when police officers request religious exemptions from their department's uniform policies. Under *Smith*'s generally applicable test, we have held that a police department's interest in "a disciplined, identifiable, and impartial police force,"[99] is "legitimate" enough "in the context of uniformed law enforcement personnel" to ban unauthorized religious symbols or items on an officer's uniform.[100] And, when it is a liberty and not a religious interest at stake, perhaps less is required; a department's "desire to make police readily recognizable to the members of the public, or a desire for the esprit de corps which such similarity is felt to inculcate within the police force itself" is a "sufficiently rational justification" to defeat an officer's liberty interest in wearing long hair.[101]

Context has been particularly important to our weighing of constitutional values when prisoners seek religious exemptions from jail restrictions under RLUIPA. Although the act gives courts the power to mete out religious exemptions to federal prisoners under strict scrutiny, Congress was "mindful of

---

[98] *Id.* at 510. Notably, Congress responded to *Goldman* by directing that "a member of the armed forces may wear an item of religious apparel while wearing the uniform," unless "the wearing of the item would interfere with the performance [of] military duties [or] the item of apparel is not neat and conservative." 10 U.S.C. § 774(a)-(b).

[99] *Daniels v. City of Arlington, Texas*, 246 F.3d 500, 504 (5th Cir. 2001).

[100] *Id.* at 505. *Cf. Webb v. City of Philadelphia*, 562 F.3d 256, 262 (3d Cir. 2009) (finding a city would suffer "undue hardship" under Title VII if forced to permit police officers to wear religious clothing or ornamentation with their uniforms).

[101] *Kelley v. Johnson*, 425 U.S. 238, 248 (1976).

34

No. 09-20091

the urgency of discipline, order, safety, and security in penal institutions."[102] Recognizing this limitation on RLUIPA, we have held a prison's interest in "security" compelling enough to uphold regulations burdening free exercise,[103] in one case explaining that long hair "facilitates the transfer of contraband and weapons into and around" prisons and makes it easier for "escaped prisoners to alter their appearance from the photographs taken periodically of all . . . inmates."[104]   At the same time, however, we have left open the related—and closer—question of whether RLUIPA protects an inmate's interest in growing a religiously-prescribed beard.[105]

Here, the context is quite different, and so is A.A.'s request for exemption. What we have in the present case is an elementary school, which, even in its most authoritarian form, is neither a military operation nor an incarceration facility.  A.A.'s religious expression does not jeopardize a school's interest in authority and discipline in the same way that it might impinge on the military's need for instinctive obedience, a police department's desire to present an impartial public face, or the penological goal of keeping prisoners in prison. Regulation of hair and dress in public schools is meant in part to instill

---

[102] *Cutter*, 544 U.S. at 723 (citing 139 Cong. Rec. 26190 (1993) (remarks of Sen. Hatch)).

[103] *See generally Sossamon*, 560 F.3d at 334 ("Texas obviously has compelling governmental interests in the security and reasonably economical operations of its prisons.").

[104] *Diaz*, 114 F.3d at 73.  *See also Longoria*, 507 F.3d at 904 (relying on *Diaz* to uphold a prison's ban on long hair).

[105] *See Garner v. Morales*, 2009 WL 5777755, at *5 (5th Cir. March 6, 2009) (unpublished) (explaining that our precedent under *Smith* upholding clean-shaven policies in the face of free exercise challenges is not dispositive under RLUIPA and remanding for a determination under the latter's heightened statutory standard).  *But see Green v. Polunsky*, 229 F.3d 486, 490–91 (5th Cir. 2000) (holding, under the *Smith* test, that a prison "has a legitimate interest generally in preventing inmates from wearing even short beards").

discipline and to teach respect for authority—not because a kindergartner is a flight risk or because he will need to take direction from superiors in a war zone—but because a grooming policy preserves order in the classroom and prepares students to become society's next generation of citizens. These goals are legitimate, but they are not served by applying the District's hair regulation to A.A. That legitimacy accepts that the wearing of long hair and unconventional dress by most boys may be seen as an act of defiance—and a rejection of authority. Well and good, but A.A.'s long hair is conceded to be an exercise, not of rebellion, but of adherence to religious belief. That adherence does not thwart the school's pedagogical mission, a teacher's dominion over her classroom, or a principal's ability to maintain an environment conducive to learning. As the District has conceded, it is an acknowledgment of piety to religion and fealty to an authority superior to individual whim. The District's regulation aimed at this acknowledgment—in the name of authority and discipline—is not a compelling interest.

With no evidence specific to A.A.'s request for exemption, the District makes no suggestion that A.A.'s visibly long hair will erode obedience and discipline among the general student population. It also puts forth no claim that a grant of an exemption here will lead to future claims destructive of the District's general policy.[106] The evidence is all to the contrary: A.A.'s religious exemption request is just the second ever received by the District (as we have noted, the first request was granted). Treating A.A.'s exemption request as an

---

[106] *See United States v. Lee*, 455 U.S. 252, 259–60 (1982) (finding that the accommodation of religious conflicts with the tax system is not constitutionally-mandated because of the likelihood that a "myriad" of individual exemptions, when aggregated together, would unduly interfere with the system as a whole).

outlier, it is, in the district court's words, "difficult to imagine that allowing one male child to wear long hair, as part of his religious beliefs, would disturb the school's sense of order."

So seen, Superintendent Rhodes's concern for aesthetic homogeneity, like the others, is insufficiently compelling to overtake the sincere exercise of religious belief. Regardless, the District's exemptions do not serve it: A.A. would still be non-conforming in appearance—either as the only child wearing a thirteen-inch braid tucked inside his shirt or the only male child wearing a bun.

## C

Had the District succeeded in presenting specific evidence connecting its concerns to A.A.'s request for exemption, any connection would be weakened by the District's decision to permit *girls* to wear their hair visibly long.[107] The District has not shown that girls with long hair are less prone to accidents or that they are better able to conform with the District's hygienic standards. Nor does the District explain why any gender confusion issues associated with A.A.'s long hair would not also be true for a girl who chose to wear her hair short, as the grooming policy allows. At the same time, the District's decision to allow some girls to wear short hair is a judgment call that "undoubtedly undermines"

---

[107] *See, e.g.*, *Merced*, 577 F.3d at 593 (noting "several exceptions that undermine" the asserted government interest in regulating religious conduct). The District and its amicus urge that any comparison between male and female grooming standards has long been rejected by the Fifth Circuit and the Texas Supreme Court. *Ferrell*, 392 F.2d at 704; *Toungate*, 948 S.W.2d at 371; *Barber*, 901 S.W.2d at 450. This argument misunderstands the relevance of comparisons between males and females. These comparisons are not meant to establish a constitutional or statutory grievance but are instead evidence that the District's grooming policy is not without secular exception, and a significant one at that: all girls.

No. 09-20091

any "interest in fostering a uniform appearance" through its policy.[108]  That the District itself contemplates secular, gender-based exceptions indicates that none of the generalized interests purportedly advanced through the grooming policy should carry "determinative weight" for TRFRA purposes.[109]  More to the point, it makes plain that it is non-conforming appearance evincing resistance to school authority that justifies the District's grooming policy; that it misses the mark to turn that code to dress and hair conceded to be born of sincere religious belief.

D

To review, while a school may set grooming standards for its students, when those standards substantially burden the free exercise of religion, they must accomplish *something*.  Under TRFRA, that "something" is a compelling interest.  The District only invokes the same five generalized interests without explaining the play of those interests here.  TRFRA demands more.  The questions of detail and degree that the District would answer for its student do not rise to the level of compelling interest, and are therefore left to the adherent alone.

---

[108] *See Fraternal Order of Police Newark Lodge No. 12 v. City of Newark*, 170 F.3d 359, 366 (3d Cir. 1999) (Alito, J.) (finding that the fire department's decision to allow medical exemptions to a fire department's "no-beard" policy undermined the department's asserted interest in promoting uniformity among firefighters).

[109] *O Centro*, 546 U.S. at 433 (explaining that because the Controlled Substances Act contemplates exempting certain people from its requirements the underlying congressional findings should not carry "determinative weight" for RFRA examination of a claimed religious exemption).  *See also Sossamon*, 560 F.3d at 334 (finding a genuine issue of material fact as to whether a prison had furthered its interests through the least restrictive means possible by barring all religious use of the prison chapel when other evidence indicated that the chapel was safely used for other kinds of prisoner gatherings).

No. 09-20091

IX

A.A. has succeeded in his free exercise claim under TRFRA. He has a sincere religious belief in wearing his hair uncut and in plain view; that belief is substantially burdened by the District's grooming policy—even with the District's proffered exemptions; and the District has put forth insufficient justification for its persistence in this matter. The Texas Supreme Court, speaking through Justice Hecht, has made plain that it reads TRFRA to have bite in the protection of religious freedom in Texas public schools, that religious freedom does not invariably fall before generic rules. Rather, the regulation must respond to specific circumstances. And it is Texas law that we apply today.

Because we do not decide questions of a constitutional nature "unless absolutely necessary to decide the case,[110] and because our holding under Texas law provides a non-constitutional basis sufficient to support the judgment below, we decline to address the remaining claims on appeal.

AFFIRMED.

---

[110] *United States v. Lipscomb*, 299 F.3d 303, 359 (5th Cir. 2002).

No. 09-20091

E. GRADY JOLLY, Circuit Judge, dissenting:

I respectfully dissent. I fully respect A.A.'s sincere religious belief that his hair not be cut, but that is not the belief on which the majority opinion rests. With respect for the scholarship of the majority opinion, its lengthy reasoning results in substantial mistakes.

I

The district court found that Native American communities "assign religious significance to hair length" and that the plaintiffs in particular "find significance in the fact that [their] hair is long." It then concluded that the plaintiffs have "a sincerely held belief that their hair should be worn long." *A.A. ex rel. Bettenbaugh v. Needville Indep. Sch. Dist.*, No. H-08-2934, 2009 WL 6318214, at *11 (S.D. Tex. Jan. 20, 2009). The court ultimately reasoned that the accommodation policy, which "will *require* [A.A.] to wear [his hair] 'in a tightly woven braid,' stuffed down the back of his shirt," substantially burdens this belief "[b]y imposing a physically burdensome [i.e., uncomfortable] restriction" that "will influence [A.A.] to *cut his hair* in violation of his religious beliefs." *Id.* at *12–13 (emphasis added).[1] In short, the district court concluded that the school district gave A.A. a Hobson's choice that effectively forced A.A. to forgo maintaining uncut, long hair and thus constituted a substantial burden on his religious belief. On appeal, the majority leaves this specific rationale of the district court in the dust bin and starts us on a meandering search for some cohesive support for the plaintiffs' claim.

The school district, on appeal, argues the district court erred in finding that A.A. was required to wear his hair tucked down his collar, or in *any* one

---

[1] *Cut*, not *hide*, even though the policy would obviously require A.A. to hide his hair.

No. 09-20091

way, and that it was further error for the district court not to consider more comfortable alternative hair styles that were also compliant (off his collar) with its grooming policy, e.g., in a braided bun. The majority concedes that the district court erred in treating "in a plait and down his collar" as mandatory. Maj. op. at 1. Thus, the question on appeal should be whether the other options proposed by the school district would unconstitutionally burden A.A.'s religious beliefs.

Clearly, none of the other "off the collar" options proposed by the school district impose a substantial burden on A.A's belief that he should not *cut* his hair. Indeed, braided hair is an option chosen often by A.A. himself. It is true, of course, that accommodations proposed by the school district would not disclose the *exact* length of A.A.'s hair.[2] And so the majority has now, on appeal, framed the plaintiffs' purported religious belief not merely to be uncut long hair, but to be the *visibility* of hair length. The majority concludes that the district court's finding—that A.A. has a sincere belief that his hair be "worn long"—is a finding not just about length, but also about hair style—that the length must be religiously *visible.*

The majority has confected this interpretation entirely on its own. First, the relevant portions of the district court's opinion never use the words "visibility" or "in plain sight," contrary to what the majority opinion suggests. Maj. op. at 10.[3] Second, the court mentions *hair length*—not visibly displayed

---

[2] Or so I assume for the purposes of this dissent. In reality, it is difficult to understand how a number of these alternatives would not expose the length of A.A.'s hair.

[3] Neither did the district court find that the plaintiffs believe that their braids "should be presented" in any particular way.

No. 09-20091

hair length—as the protected religious belief nearly a dozen times.[4] Third, the substantial burden analysis of the district court was concerned *only* that the "in a plait and down his collar" accommodation encouraged A.A. to cut his hair, i.e., was a "substantial burden" on his religious belief of not cutting his hair. The district court expressed no concern that "in a plait down his collar" would hide his hair.[5] Fourth, interpreting the district court as addressing visibility as a religious belief rests uncomfortably with other portions of the district court's opinion; that is, the district court gave full discussion to visibility of hair length in the section of its opinion concerning free speech. In short, nothing in the district court's opinion indicates an acceptance of A.A.'s argument that visibility was a protected belief; only by seizing a single line out of the district court's opinion—"A.A. [has] a sincerely held belief that [his] hair be worn long," *A.A.*, 2009 WL 6318217, at *11—and then reading it out of context could the majority extend the district court's findings on uncut long hair to visibility of the length of hair.

The majority nevertheless reasons that the district court's statement—that "their hair should be worn long"—contains an implicit finding on the sincerity of the plaintiffs' alleged belief in visibility because the district court used the word "worn." According to the majority, "worn" means to

---

[4] *See A.A.,* 2009 WL 6318217, at *17 ("assign religious significance to hair length"; "long hair addresses 'fundamental' and 'ultimate' concerns"); *18 ("Arocha has not cut his hair"; "he refused to cut his hair"; "[his] decision to shave his hair on the sides does not weaken the sincerity of his [beliefs]"; "[he] has 'kept the length'"; "hair is long, not full"); *20 ("otherwise, he will be forced to cut his hair"; "policy will influence him to cut his hair in violation of his religious beliefs").

[5] If the district court were concerned about visibility, it would certainly have mentioned that the "down his collar" policy covered up A.A.'s braid as a ground for its decision. The "down his collar" policy burdened visibility, not length.

No. 09-20091

"exhibit" or "present."  But common sense strongly cuts against interpreting "worn" to denote visibility.  If "worn" means visible, t-shirts, socks, and petticoats, not to mention ordinary garments worn under sweaters and jackets, are not being worn because they are not seen.  Defining the word "worn" to require "visibility" leaves one virtually gobsmacked.[6]

## II

The non-faux issue on appeal, as reflected in the opinion and analysis of the district court, is whether restrictions on A.A.'s choice of hair style constitute a substantial burden on the religious belief that his hair must not be cut.

The majority—somehow melding or confusing the religious belief it asserts, i.e., visibility, with whether that belief is substantially burdened—says that any hair style that conceals the exact length of A.A.'s hair is a substantial burden on his religious belief.  The district court, however, never extended its holding this far.  The district court only said that "in a plait and down his collar" was an uncomfortable manner of wearing his hair; this discomfort was a substantial burden upon wearing uncut long hair because the discomfort would encourage A.A. to cut his hair.  All parties agree that the district court erred in assuming that "in a plait and down his collar" was the only choice available to A.A.  Thus the school district argues, and I agree, that the religious belief of uncut long hair reasonably can be accommodated by wearing hair in a ponytail as a bun (or down the collar if he chooses; a t-shirt would seem to minimize the discomfort that concerned the district court).

---

[6] Of course, even if the district court made some finding as to visibility, there is little reason to believe that it was so specific as to prohibit a hairstyle that is fully visible but hides some length, such as a bun atop his head.

43

No. 09-20091

As I have said, in addressing the substantial burden issue, the majority rests on its erroneous conclusion that A.A. has a belief in visibly long hair. It argues that any hair style that conceals the exact length of A.A.'s uncut long hair is a substantial burden on the religious belief of visible long hair. This argument is belied because hair plaited in a bun or on top of his head is *visible* long hair.

But the majority—though not the district court—further argues that any restriction on A.A.'s hair style is a substantial burden because compliance will portray A.A. as a cipher who cedes his religious belief to the authority of the school district and thus he will be officially stigmatized. Maj. op. at 27. If he can wear his hair in any style he wishes, the majority reasons, his religious belief would then bear no official imprimatur of school district policy. With due respect, this is not sensible. By this reasoning, any regulation of religious expression constitutes a substantial burden because regulation presumptively restricts the right at issue and thus stigmatizes the assertive student who is in compliance. This is not, nor has it ever been, the law. As the majority agrees, Maj. op. at 24, a regulation constitutes a substantial burden only if "alternatives for the religious exercise are severely restricted." *Barr v. City of Sinton*, 295 S.W.3d 287, 305 (Tex. 2009). This leaves ample room for minimally invasive regulations, such as the one at issue here.

### III

For the reasons asserted herein, I essentially dissent from the majority's conclusions *in toto*.

44